Howard MILLER, et al.  Plaintiffs,

v.

THANE INTERNATIONAL, INC., et al.  Defendants.

No. SACV 03–1031JVS.

United States District Court, C.D. California.

June 2, 2005.

Daniella Quitt, Joel C. Feffer, Peter W. Overs Jr., Robert I. Harwood Wechsler & Harwood, New York City, Lionel Z. Glancy, Michael M. Goldberg, Peter A. Binkow Glancy & Binkow, Los Angeles, CA, for Plaintiffs.

Colin H. Murray, Baker & McKenzie, San Diego, CA, Daniel J. Tyukody Jr., Jason L. Krajcer, Michael C. Tu, Orrick Herrington & Sutcliffe, Los Angeles, CA, Lawrence H. Davidson, Marshall S. Brenner, Robert M. Mansukhani, Gordon & Rees, San Diego, CA, for Defendants.

## Memorandum of Decision

SELNA, District Judge.

This matter came on for trial before the Court on the plaintiffs' single claim for violation of Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l (a)(2): misrepresentation in connection with a securities offering. On October 27, 2004, the Court certified this case as a class action, and confirmed Joseph J. Milkowski ("Milkowski") as the named class representative. (Minute Order, Oct. 27, 2004, pp. 3–5.)

The context of this case is a merger transaction in which the shareholders of Reliant Interactive Media Corp. ("Reliant") received shares of Thane International, Inc. ("Thane"). Milkowski and his class members contend that the prospectus distributed to Reliant shareholders contained a material misstatement of fact because Thane did not list its stock on the NASDAQ National Market System ("NMS") following the merger, notwithstanding numerous alleged representations to the contrary. Plaintiff seeks to recover against Thane and against its officers and directors as "control persons" under Section 15 of the 1933 Act (15 U.S.C. § 77o).

### I. Background.

The following background facts are drawn from the substantial factual stipulations which the parties made in the Pretrial Conference Order.

#### A. The Parties.

The plaintiff class consists of all persons and entities who acquired Thane's shares pursuant to the merger between a wholly-owned subsidiary of Thane and Reliant, other than defendants and Reliant's principal stockholders. Plaintiff Milkowski is the class representative.[1]

Defendant Thane is a Delaware corporation and markets consumer products related to fitness, health and beauty, and housewares.

There are four individual defendants. William F. Hay ("Hay") is Thane's co-

---

1. The Court declined to accept the original plaintiff, Howard Miller, as the class representative because he was arguably subject to a defense not typical of class members. (Minute Order, June 14, 2004, pp. 3–4.)

founder and served as Chairman of Thane's Board of Directors and Chief Executive Officer of Thane at all relevant times. Denise DuBarry–Hay ("DuBarry–Hay") is Hay's wife and a co-founder of Thane, and has served as a director and as Chief Creative Officer of Thane at all relevant times. Kevin McKeon ("McKeon") was Thane's Chief Financial Officer at all relevant times. Mark Taylor ("Taylor") was a director and Chief Operating Officer of Thane from May 1992 through December 2001, when he was named President. Each of the individual defendants signed the Registration Statement filed with the Securities and Exchange Commission ("SEC"). The Proxy Statement/Prospectus ("Prospectus") sent to Reliant shareholders to solicit their votes for the merger was a part of the Registration Statement.

## B. *The History of the Transaction.*

Prior to the merger, Reliant's securities traded in an efficient market, and traded on the on NASDAQ's Over–the–Counter Bulletin Board ("OTC–BB"). Prior to the merger, Thane's stock was not publicly traded.

Reliant and Thane executed a definitive merger agreement on November 21, 2001, which was amended on or about December 6, 2001. On November 26, 2001, Reliant and Thane issued a joint press release announcing the merger and its terms: Each Reliant stockholder would receive a 0.3049459 share of Thane common stock for each share of Reliant common stock surrendered upon the merger of Reliant with a wholly-owned subsidiary of Thane. Collectively, the Reliant stockholders would receive approximately 3.5 million shares of Thane common stock.

On January 3, 2002, in connection with the merger, Thane filed with the SEC a combined proxy statement and prospectus, as part of a Form S–4 Registration Statement. The Registration Statement was amended on February 21, 2002, March 29, 2002, April 23, 2002, and once again on April 26, 2002 whereupon it was declared effective by the SEC.

During April 2002, the individual defendants attended a meeting held in New York City with investment bankers and others. At the meeting, Thane was advised by the investment bankers to delay its planned listing on the NMS to coincide with another planned merger and an accompanying secondary offering. The recommendation was that Thane list on the OTC–BB, where Reliant was listed, until that time.

In connection with the distribution of the Prospectus to Reliant's stockholders, as well as in connection with other aspects of the merger transaction, the means and instrumentalities of interstate commerce and the mails were used, including mailing the Prospectus to Reliant's stockholders on or about April 29, 2002.

On or about May 20, 2002, Reliant's stockholders voted to approve the merger, and the merger was effected shortly thereafter. Each Reliant shareholder received 0.3049459 shares of Thane common stock for each share of Reliant common stock owned immediately prior to the merger. Plaintiffs calculate the "merger price," which is the value of Reliant stock each Reliant shareholder surrendered for each Thane share they received in the merger, at $6.99 per share. Defendants calculate the merger price as $6.89 per share.

## C. *Representations in the Prospectus.*

The Prospectus discussed in numerous places the subject of listing the Thane shares on the NMS, beginning with the cover page:

The shares of Thane common stock to be received by the stockholders of Reliant in connection with the merger have been approved for quotation and trading

on the NASDAQ National Market upon completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share.[2]

(Ex. 28, p. 2.)[3] Reliant shareholders were told in the "SUMMARY OF PROPOSED MERGER":

> The combined company is expected to meet the initial listing requirements of the NASDAQ National Market, which would provide the Reliant stockholders with greater liquidity than they have with Reliant common stock trading on the over-the-counter market. (*Id.* at 12.)

> The Thane common stock to be issued in connection with the merger has been approved for quotation and trading on the NASDAQ National Market upon the completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share. (*Id.* at 14.)

The "QUESTIONS AND ANSWERS ABOUT THE MERGER" section of the Prospectus also focused on NMS listing:

> Q: Will Reliant continue as a public company if the merger agreement is approved?

> A: No. Reliant will become a wholly-owned subsidiary of Thane upon the completion of the merger, and Reliant stockholders will become holders of Thane common stock. Thane has received approval for quotation and trading of its common stock on the NASDAQ National Market upon completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share. (*Id.* at 19.)

---

**2.** Similar statements appear elsewhere. (Ex. 28, p. 102.)

**3.** Exhibit 28 is a version of the Prospectus printed from the SEC's EDGAR web site data

Listing also was discussed in the "Reliant Board Considerations" section:

> The combined company is expected to meet the initial listing requirements of the NASDAQ National Market, which would provide the Reliant stockholders with greater liquidity than they have with Reliant common stock trading on the over-the-counter market. (*Id.* at 49.)

As part of the Prospectus, Reliant shareholders were provided a copy of the Merger Agreement. In Section 6.5(b), the Merger Agreement discusses listing under "Covenants of Thane":

> Thane shall use commercially reasonable efforts to cause its outstanding Thane Common Stock immediately after the Merger to be approved for quotation on the NASDAQ National Market System or, in Thane's reasonable discretion another national securities exchange, subject to official notice of issuance, as promptly as practicable after the date hereof, and in any event prior to the Effective Time.

(*Id.* at 339.) Thane was required, as a condition precedent to Reliant's obligation to consummate the merger, to have "complied in all material respects with all covenants." (*Id.* at 340, Merger Agreement, Section 7.1(b).)

### D. *NMS Approval.*

By letter dated April 9, 2002, NASDAQ notified Thane that it approved Thane's application to list its securities on the NMS, and thus Thane had approval prior to the merger closing. Thane's stock met the minimum $5.00 per share requirement for listing on the NMS when the merger

---

base. Page numbers refer to the number in the upper right hand corner. For example, page 2, the cover, is shown as Pages 2 of 389.

closed. However, Thane's stock was never listed for trading on the NMS.

### E. *Post–Merger Trading and Events.*

On May 24, 2002, the Thane–Reliant merger was completed and Thane's shares commenced trading on the OTC–BB. The number of freely tradeable Thane shares on the OTC–BB post-Merger was approximately 1,422,406 shares, or approximately 4% of the 35,323,784 outstanding shares of Thane.

Between May 24, 2002 and June 11, 2002, Thane's reported stock price ranged between $7.00 and $8.50 per share. On June 24, 2002, Thane's reported closing stock price was $6.00 per share, and on June 25, 2002, Thane's reported closing stock price was $5.25 per share.

Thane announced its earning results for the 2002 fiscal year on June 25, 2002.

On June 25, 2002, nine additional market makers began trading in Thane's stock (for a total of eleven market makers).

On June 28, 2002, Thane's stock price went below $5.00 per share for the first time, and thereafter the closing price stayed below $5.00 per share.

On August 14, 2002, Thane announced its earnings results for the first quarter of the 2003 fiscal year in its Form 10–Q, dated June 30, 2002, which were approximately 46% lower than the earnings for the same quarter in the prior year ($0.07 per share vs. $0.13 per share). The Form 10–Q told investors that Thane was not going to proceed with listing on the NMS:

> In May and June of this year, we met with our investment bankers to discuss an underwritten public offering of our common stock. Our investment bankers advised us that we could potentially obtain more favorable pricing for the public offering if we implemented our move to the NASDAQ National Market in conjunction with the underwritten public offering. Over the course of June and July we have been preparing for the public offering, but we have recently concluded that present market conditions are no longer favorable for an underwritten public offering of common stock. As such, we are currently evaluating the listing of our common stock on a national market.

(Ex. 12, p. 12.) From August 13, 2002 through August 16, 2002, the reported closing price of Thane's shares declined from $3.60 reported per share to $1.95 reported per share.

In February 2004, Thane completed a going-private transaction in which Thane's stockholders received $0.35 for each of their shares. Milkowski did not sell any of the Thane shares he received in the merger until Thane's going-private transaction in 2004. Plaintiffs assert that 386,444 shares of Thane stock in the public float were held and never sold between May 24, 2002 and the time of Thane's going-private transaction.

## II. *The Trial Testimony.*

Pursuant to the Court's standard order for Bench trials, the direct examination of each witness was received by way of declaration. Each witness was then tendered for cross-examination. To varying degrees, the parties availed themselves of redirect and recross-examination.

### A. *Joseph J. Milkowski.*

In 2001, Milkowski purchased 8,000 shares of Reliant in three separate transactions. (Milkowski Decl., ¶ 5.) The following year he sold 1,500 shares. (*Id.*) At the time of the merger, he owned 6,500 shares which were converted into 1,982 Thane shares. (*Id.,* ¶ 10.) The shares were worth about $14,000. (*Id.*)

Following the merger, Milkowski learned that Thane's shares were not trading on the NMS. (*Id.,* ¶ 11; Milkowski

Depo., pp. 62–63.) He made some inquiries of Thane's investor relations person who referred him to Jorge Freeland, a lawyer with Thane's outside counsel. (Milkowski Decl., ¶ 13.) As Milkowski relates:

> Mr. Freeland also advised me that there would be a new development at Thane that would benefit Thane's shareholders in the next four to six weeks. I spoke with Mr. Freeland approximately four weeks later, and he again urged me to be patient. *Mr. Freeland's representations played a role in my decision not to sell my Thane stock at that time.*

(*Id.;* emphasis supplied.) Milkowski realized at the time he could have sold his shares at a profit. (1 Tr. 47.) However, he made an affirmative investment decision to hold his shares:

> After about a month the stock had gone down probably to three dollars, and it was already, you know, a situation where you just take a position, well, when all this is resolved and they start operating their company in the way that they're supposed to, the price will come back. (Milkowski Depo., p. 68.) Milkowski was in for the long haul: "The potential for the company was it could do very well. That's why you invest in it, . . . ." [4] (*Id.*)

When Thane went private in 2004, Milkowski received $.35 a share, or approximately $700, for his holdings. (Milkowski Decl., ¶ 16.)

### B. *Individual Defendants.*

On December 5, 2001, the Thane Board of Directors executed a resolution authorizing all steps necessary for the merger and NMS listing. (Ex. 7, pp. 7–2 7–3.) Hay, DuBarry–Hay, and Taylor signed the resolution. (*Id.,* pp. 7–10, 7–11, 7–12.)

---

[4]. For reasons set forth below, the Court does not consider whether Milkowski made a "second investment decision" which would bar him from recovering for any misrepresentation.

Each of the individual defendants testified that they attended a meeting in April 2002 at which Jonathan Weintrab, a representative of the lead underwriter UBS Warburg, recommended that Thane coordinate its NMS listing with an anticipated secondary offering. (Hay Decl., ¶ 4; DuBarry–Hay Decl., ¶ 3; Taylor Decl., ¶ 4; McKeon Decl., ¶ 3.) According to Sami Mnaymneh, the managing partner of Thane's major shareholder and a participant in the meeting, the investment bankers described the deferral strategy as "the ideal scenario." (Mnaymneh Depo., p. 18.) Hay testified that the investment bankers believed that the secondary offering would look more like an initial public offering ("IPO"), and would make the securities more attractive to institutional investors. (1 Tr. 63.) The time line presented at the meeting showed an effective date for the registration between late June and late July, depending on SEC reviews. (Ex. 136, pp. 5, 7.)

In their trial declarations, Hay, Taylor, and McKeon each state that he knew when he signed the Registration Statement that Thane would not seek immediate NMS listing, but rather would defer listing in accordance with the strategy outlined by UBS Warburg. (Hay Decl., ¶ 6; Taylor Decl.; ¶ 5; McKeon Decl., ¶¶ 3, 5.) However, at trial, Taylor denied this. (1 Tr. 98.) DuBarry–Hay testified that she learned of this decision only after the merger. (DuBarry–Hay Decl., ¶ 3.)

*Hay.*

As a member of the Board of Directors, Hay had the ability to control the content of the Prospectus. (1 Tr. 54.)

*DuBarry–Hay.*

DuBarry–Hay was Thane's Chief Creative Officer during 2002. (DuBarry–Hay

Decl., ¶ 1.) Although a Board member, her role in the actual management of the business was relatively minor compared to the roles of the other individual defendants. (*Id.*, ¶ 3.)

*Taylor.*

During 2002 Taylor was Thane's CEO and president, and also a member of the Board. (Taylor Decl., ¶ 1.) He outlined his duties as overseeing the day-to-day operations of Thane, and specifically denied responsibility for the merger process either in terms of decision-making or drafting the merger documents. (*Id.*, ¶ 3.) He signed the Registration Statement, and believed that his signature was necessary to complete the merger. (1 Tr. 91–92.)

*McKeon*

McKeon was Thane's Chief Financial Officer. (McKeon Decl., ¶ 1.) McKeon had a major role in the merger transaction. (*Id.*, ¶¶ 2, 6.) He was responsible for 80% of the content of the Prospectus, putting aside product description. (1 Tr. 126.) He was the lead person in handling the details of NMS listing with NASDAQ. (McKeon Decl., ¶ 6.) He contends that he did not play a decision-making role in the decision to defer listing: "[A]s a factual matter it was not my call." (*Id.*, ¶ 3.) He signed the Registration Statement, and believed that his signature was necessary to complete the merger. (1 Tr. 127.)

C. *The Experts.*

The parties both offered expert testimony on the subject of materiality: from Candace L. Preston ("Preston") on behalf of plaintiffs and from Bradford Cornell ("Cornell") on behalf of defendants. Their testimony is discussed below in light of the substantive elements for a violation of Section 12(a)(2).

III. *The Substance of the Section 12(a)(2) Claim.*

The requirements of Section 12(a)(2) of the 1933 Securities Act are straight forward and undisputed: Plaintiff must show that there was (1) an offer or sale of securities, (2) by use of any means of interstate commerce, (3) through a prospectus or oral communication, (4) which included an untrue statement of material fact or omitted to state a material fact. 15 U.S.C. § 77*l* (a)(2); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 577–78, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). In terms of plaintiffs' *prima facie* case, the only element in dispute is the fourth. Thus, the Court turns to the threshold determination of whether the statements in the Prospectus with regard to NMS listing were false, and if so, whether they were material.

A. Were the Statements in the Prospectus with Regard to Listing on the NMS false?

██ A careful facial reading of the Prospectus indicates that Thane made only two basic representations concerning NMS listing. First, Thane would use commercially reasonable efforts to cause the shares to be qualified and approved for quotation on the NMS or a national exchange. The clearest expression is in the Merger Agreement which is attached to the Prospectus:

> Thane shall use commercially reasonable efforts to cause its outstanding Thane Common Stock immediately after the Merger *to be approved for quotation* on the NASDAQ National Market System or, in Thane's reasonable discretion another national securities exchange, subject to official notice of issuance, as promptly as practicable after the date hereof, and in any event prior to the Effective Time.

(Ex. 28, p. 339; emphasis supplied.) Second, Thane reported that it had in fact qualified for listing on the NMS subject only to compliance with the NASDAQ $5 minimum-price requirement. The clearest expression is on the cover of the Prospectus:

> The shares of Thane common stock to be received by the stockholders of Reliant in connection with the merger *have been approved for quotation and trading* on the NASDAQ National Market upon completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share.

(Ex. 28, p. 2; emphasis supplied.)

Both representations are literally true: Neither affirmatively states that Thane's shares have or will in fact be listed on the NMS. *Contrast Blasdel v. Mullenix,* 356 F.Supp. 924, 925 (W.D.Okla.1971) (defendant represented "that the stock of the Corporation *would be listed* on the New York Stock Exchange"; emphasis supplied). The drafting history of the Prospectus reinforces this view.

Plaintiffs' expert Candace Preston testified that the market was absorbing the material in Thane's initial SEC filing and the follow-on amendments. (1 Tr. 158–59; 2 Tr. 187–88.) The initial Prospectus went farther than the above statements, and described actual listing as a condition of the merger:

> It is a condition to the merger that the shares of Thane common stock to be received by stockholders of Reliant in connection with the merger *be quoted or listed* on the NASDAQ national market or a national securities exchange.

(Ex. 100, p. THNE 00368; emphasis supplied.) By the time Amendment 3 issued, the final version of Prospectus distributed to Reliant shareholders, the condition was dropped. (*See* McKeon Decl., ¶ 7.) The Court believes that this would cause an investor to give the statements concerning NMS listing no more than their literal meaning. Said another way, if a condition to list is eliminated, a reasonable investor would infer that there was no promise to list.

Preston testified at trial that the deletion of the condition along with the shift from reporting that qualification would be obtained to the fact that qualification had been obtained somehow confirmed to the market that the stock would be listed on the NMS. (1 Tr. 158.) The Court rejects this logic. The fact that Thane had qualified for listing did not fulfill the condition in the initial Prospectus, and the significance of the deletion was unchanged by the fact that the stock had been approved for listing.

Preston testified that the language of the Prospectus created the "obvious inference" that Thane would list immediately. (2 Tr. 185; Preston Decl., ¶ 36.) Howard Miller, the original named plaintiff, and Milkowski both testified that they believed on the basis of the Prospectus that listing would be immediate. (Milkowski Decl., ¶ 8; Miller Depo., p. 37.) The Court cannot subscribe to this theory particularly in light of the deletion of listing as a condition of the merger.

█ The Court is mindful that a literally true statement may be misleading if belied by the context. *Kaplan v. Rose,* 49 F.3d 1363, 1372 (9th Cir.1994); *In re Convergent Technologies Securities Litigation,* 948 F.2d 507, 512 (9th Cir.1991). There is nothing in the Prospectus that can be juxtaposed with the obligation to secure approval which can turn it into an obligation to list, a different task with different requirements. By contrast, in *Kaplan,* one could take Medstone's statement that its lithotripsy system had been "successfully" used, and juxtapose its 18.5% success rate with its competitor's 80% success rate.

*Kaplan,* 49 F.3d at 1372. In that light, it was a question of fact whether Medstone's statement amounted to a misrepresentation. That is not the present case.

The Court finds that plaintiffs have failed to show a misrepresentation by a preponderance of the evidence. The Court affirmatively finds that the statements regarding listing were not false.

B. *Assuming that Thane Represented That It Would in Fact List on the NMS Following the Merger, Was the Representation Material?*

In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court set out the test for materiality:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Accord Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 934 (9th Cir.2003). In making a determination of materiality, *America West* requires a "fact-specific inquiry" which cannot be short-circuited by mere failure of the market to react to the relevant information. (*Id.* at 935.)

The parties and their experts take widely divergent views on the significance of NMS listing. Preston likened the move from the OTC–BB to the NMS as the corporate equivalent of a major life event such as marriage or the birth of a child. (2 Tr. 212–13.) Thane's expert chose a different analogy, characterizing listing as the equivalent of buying a new car with chrome wheels rather than without-nice but not essential. (2 Tr. 273.) Apart from their conclusions, they both differed on the role of stock price as an indicator of materiality. Preston did not take it into account; Cornell testified that from the standpoint of an economist, reference to price is an essential part of any determination of materiality. (1 Tr. 169; *see* 2 Tr. 217–18; Cornell Decl., ¶ 32.)

1. *Candace L. Preston.*

Preston holds an M.B.A from the Wharton School Finance, University of Pennsylvania, a Chartered Financial Analyst ("CFA") certification from the CFA Institute, and has an extensive background in consulting on various issues which arise in securities cases. (Preston Decl., ¶¶ 2–3, 7.) She has also been received as an expert in a number of federal securities cases and other proceedings. (*Id.,* ¶¶ 8–9.) The Court finds that Preston is well-qualified, and entitled to express an expert opinion on the subject of materiality.

Preston's basic opinion is that the statements in the Prospectus with regard to listing following the merger were "material to investors in Reliant considering whether or not to continue to hold their Reliant shares and exchange them for Thane shares or to sell them in the open market before the Merger." (*Id.,* ¶ 14.) In forming her opinion, Preston reviewed the Prospectus and related correspondence to investors. (*Id.,* ¶¶ 15–18.) Among other things, the documents described NMS listing as one of the reasons for the merger because the listing would provide greater liquidity for the shares. (*Id.,* ¶ 18.) She explained that greater liquidity "is generally accompanied by greater investor returns." (*Id.,* ¶ 22.) This is so because liquidity reduces the spread between the bid and asked price for shares, and pro-

vides the ability to execute incoming orders immediately as well as resiliency, the ability to execute small orders without large changes in the market price. (*Id.*, ¶¶ 23–24.)

She also noted that listing on the NMS results in greater information in the marketplace because *The Wall Street Journal* and similar publications report daily prices on the NMS, but not on the OTC–BB, where Reliant's shares had previously traded. (*Id.*, ¶ 27.) Listing has several other advantages including greater prestige in investors' assessment of the stock because of the NMS's higher standards, the ability to make purchases on margin, and freedom from state "Blue Sky" law.[5] (*Id.*, ¶¶ 28–29.) The failure to list immediately also delayed the number of market makers in Thane's stock. (*Id.*, ¶ 44.) In the first, thirty days after the merger, Thane had only two market makers.[6] (*Id.*, ¶ 47.)

In her analysis, Preston contended that Thane's stock price was not a valid measure of materiality. She noted that Thane initially had only two market makers, Blair and SunTrust, whom she characterized as conflicted or not disinterested. However, she had no basis to contend, and there was no evidence, that either or both of the market makers had manipulated or artificially inflated the stock following its listing on the OTC–BB. (1 Tr. 173–76.) When confronted with the fact nine more market makers came on the scene in late June 2005, she rejected the notion that the breach of a supposedly material promise to list on the NMS would not have deterred their trading in a suspect stock, suggesting

unconvincingly that firms would make a market (and a profit) in the stock of even in fraudulent companies. (1 Tr. 176–77.)

Despite her criticism of Thane's efficiency, she testified that the market would give Thane a ten-day grace period within which to list. (Preston Decl., Ex. A, ¶ 50.) She conceded that the market could absorb the fact of Thane's non-listing. (2 Tr. 203–04.)

### 2. *Bruce Cornell.*

Thane's expert Bradford Cornell is a Professor of Finance and Director of the Bank of America Center at the Anderson Graduate School of Management at the University of California, Los Angeles. He holds a doctorate from Stanford University in financial economics. He has written extensively, and has been accepted as an expert in at least 14 different litigations. (Cornell Decl., ¶¶ 5–7.) The Court finds Cornell well-credentialed and qualified to express an opinion on materiality.

Cornell analyzed the effect of trading on the NMS versus the OTC–BB from two perspectives: theoretical and empirical. On the theoretical level, Cornell opined that a stock derives its value from an assessment of the company's expected discounted cash flow, and, in his opinion, from the company itself and its inherent characteristics, and not where its stock trades. (*Id.*, ¶ 13.) He similarly expressed the view that a company's liquidity is predominantly driven by its inherent characteristics rather than the market on which it trades. (*Id.*, ¶ 14.) With respect to small companies such as Thane, he identified

---

**5.** The testimony of Reliant CEO Tim Harrington validates a number of these considerations, and as he notes in his testimony, the favorable advantages of NMS listing were raised in the preliminary discussions which led to the merger. (Harrington Depo., pp. 24–26, 51.)

**6.** Preston also notes the fact that listing was a condition of the merger as one of the factors leading to her materiality opinion. (Preston Decl., ¶¶ 15–17.) However, as noted in the discussion of misrepresentation, that condition was not part of the deal as consummated. (*See* McKeon Decl., ¶ 7.)

high volatility, small public float in relationship to the number of outstanding shares, low trading volume, and sparse news and analyst coverage as factors playing a much greater role in liquidity than the market on which the company was listed. (*Id.*) Cornell characterized the effect of where a stock lists as a "second-order effect" which is "quite ancillary." (*Id.*, ¶ 13.) This would suggest that in the abstract the choice of exchange on which to list is not material.

In his empirical analysis, Cornell conducted an event study of Thane's stock from May 24, 2002, the day Thane first traded on the OTC–BB after the merger, through September 23, 2002. As part of the analysis, he established a group of peer companies against which to assess the movement in Thane's stock price, and created a value-weighted index. (*Id.*, ¶¶ 25–26.) He also used the NASDAQ Composite Index as a benchmark for assessing Thane's price movement. Factoring out Thane specific news which affected its price, Cornell found that Thane generally followed the trend of the peer group index and the NASDAQ Composite Index.[7] (*Id.*, ¶¶ 27–28; Exs. 188, 190.)

Focusing on Thane's August 14, 2002 quarterly earnings report, Cornell concluded that the stock was able to impound that (unfavorable) news within 72 hours, notwithstanding the relative complexity of the

report. (*Id.*, ¶ 28.) Cornell also noted the stock likely impounded the June 25, 2002 report of a one-time charge of about $10 million. (*Id.*, ¶¶ 34–35.)

Based on his overall analysis, Cornell concluded that Thane shares certainly impounded the effect of non-listing within the first 19 days of trading while it was still above the merger exchange price. (*Id.*, ¶ 28.) In addition, Cornell concluded that impoundment of the fact of non-listing was a one-time event. (*Id.*, ¶¶ 30–31.) In doing so, he rejected Preston's "market credibility" theory.[8] He testified that any confusion associated with whether Thane would list on the NMS would have been cleared up within three days.[9] (2 Tr. 339–40.)

### 3. *Conclusions re Materiality.*

■ If the Court considered the issue of listing in a vacuum-that is, without regard to price effects-the Court would find that listing on the NMS is marginally material. To be sure, NMS listing and its attendant benefits are discussed many times in the Prospectus. However, the empirical studies which Preston relied upon show that moving from the OTC–BB to the NMS does not always produce a positive effect on spread reduction and increase in volume, two of the major benefits to be achieved by such a move. In a study by

---

7. Thane's CEO Hay made the same observation. He believed that the stock declined following the merger because the industry was not doing well generally. (Hay Decl., ¶ 7.)

8. The Court finds that the plaintiffs' attacks on Cornell's credibility fail to diminish the overall value of his opinions. Cornell's prior statement to the effect that event studies tend to bias, or minimize, damage determinations (Ex. 63, pp. 146–47) does not lead to the conclusion that his use of an event study for a different purposes here-to assess the efficiency of Thane stock-is flawed. Cornell's testi-

mony in *Panavision* that price is irrelevant (Ex. 64, ¶¶ 5–13) is reflective of what he viewed as a peculiar fact situation, and not a general expression of economic principles. Here, Cornell relies on general economic principles in emphasizing price as a factor in determining materiality.

9. Cornell believes that the confusion would have lasted longer if the representation about listing was indefinite as to time. (2 Tr. 339–40.) However, that opinion is irrelevant given plaintiffs' theory that the representation was for immediate listing.

Baker and Feldman, the mean difference in spreads was a little less than 6 cents per share, and the mean increase in volume was about 20 percent.[10] (Ex. 43, p. 85 (internal pagination).) However, the results were not uniform. For about 60 percent of the companies the spread was reduced, but for about 40 percent the spread actually increased. (*Id.*, p. 86 (internal pagination).) Changes in volume show almost the same ratio of favorable to unfavorable changes. (*Id.*) In the abstract, Preston could not say that a stock would benefit from transferring from the OTC–BB to the NMS, but she generally thought Thane would. (2 Tr. 225 –27.) In this particular case, however, Preston could not say what the result would be for Thane stock in terms of spread and volume, or even whether the changes would be positive.

■ If the Court factors in the price effect, the Court believes that listing on the NMS was not a material fact. If a stock trades in an efficient market, a failure of the market to react to the disclosure of news is an indicator that the news is not material. *In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1330 (3d Cir. 2002); *Oran v. Stafford*, 226 F.3d 275, 282–83 (3d Cir.2000); *In re Fidelity/Apple Securities Litigation*, 986 F.Supp. 42, 48 (D.Mass.1997). In considering the price effect, the Court needs to address two questions. First, can one even assess the price effect in Thane given that it did not trade in an efficient market? Second, did Thane's stock impound the fact that the stock was not listed on the NMS without a change in price?

Judicial consideration of efficient market theory usually arises in the context of certifying a securities class action based on a fraud-on-the-market theory. *Basic Inc.*, 485 U.S. at 242, 108 S.Ct. 978; *Binder v. Gillespie*, 184 F.3d 1059, 1063–64 (9th Cir. 1999). The purpose of the market analysis is to determine if the element of reliance for each class member can be presumed, thus avoiding the necessity of showing each individual investor's reliance, a showing, which if required, would defeat certification. Where the presumption can be made, a significant burden is lifted from the shoulders of those seeking to prosecute on a class basis. In the context of a Rule 23 determination, the trial court is no ordinary fact finder: "Recognizing the important due process concerns of both plaintiffs and defendants inherent in the certification decision, the Supreme Court requires district courts to conduct a rigorous analysis of Rule 23 prerequisites." *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). In discharging their duties, many courts have looked to the factors enumerated in *Cammer v. Bloom*, 711 F.Supp. 1264, 1286–87 (D.N.J.1989). *E.g., Binder*, 184 F.3d at 1064–65. *Cammer* and its progeny set a very high bar before a finding of market efficiency can be made

The Court perceives its duty to be somewhat different than if it were called to make a class certification. There are no tones of sweeping due process consequences; rather the inquiry here is the same whether the Court were simply analyzing a substantive claim asserted by Milkowski alone or by a class. To do that, the Court proceeds with a preponderance of the evidence standard. While the core

---

**10.** The Court does not attach much significance to the fact that the individual defendants signed a waiver of any requirement to list. (*See* Ex. 5, pp. 5–2 and 5–3.) The signatories were acknowledging compliance with the obligation to use commercially reasonable efforts under Section 6.5(b) of the Merger Agreement to secure qualification for listing. The waiver of any requirement to list on the NMS was a waiver of a phantom obligation: none existed under the Merger Agreement.

inquiry is the same on class certification or the present determination of materiality-whether Thane's stock impounded the fact that it did not list on the NMS without a change in price-the Court need reach its conclusion only by a preponderance of the evidence. The issue is whether the evidence shows that as a matter of fact the stock impounded the price, not whether all of the *Cammer* factors are rigorously met. In taking this tack, the Court admittedly proceeds into unchartered waters. Perhaps because all the market efficiency cases arise in the class certification context, neither the parties nor the Court have identified any cases where a court has found information impounded in less than a fully efficient market.

There are a number of factors which lead the Court to the conclusion that Thane had the ability to impound the fact of non-listing fairly promptly. First, although neither expert found that Thane's stock traded in an inefficient market (1 Tr. 169; 2 Tr. 315–16),[11] both agreed that Thane stock had the ability to absorb information. (2 Tr. 203, 306–08, 312.) Preston even agreed that Thane stock had the ability to absorb the specific fact that the stock had not listed on the NMS, but she demurred that one could not tell how or when the impoundment occurred. (2 Tr. 204.) Thane's shares clearly absorbed earnings reports. When Thane announced an earnings shortfall on August 14, 2002, the stock dropped over 40% in price over

three days.[12] Cornell testified that the time for a stock to impound an event in its price is partly dependent on the complexity of the information. A quarterly statement, such as Thane issued in August 2002, carried a good deal of complexity beyond a simple comparison with prior earnings. By contrast, the failure to list on the NMS after the merger was totally transparent.[13] It was a fact which could be absorbed by the market immediately.

Second, the stock price reacted to events generally in the market and in the peer group identified by Cornell. This can be seen graphically in Exhibits 188 and 190. This is a further indicator that the stock had the ability to impound market information. This pattern negates the notion that stock price simply represented a random walk divorced from information available to the market.

Third, it is significant that Reliant, which traded on the OTC–BB immediately prior to the merger, traded in an efficient market.[14] To be sure, Thane represented a new product mix with new management, but it was not an entity unknown to the marketplace, such as an IPO.

Fourth, there was never any inability to sell shares into the market following the merger. Nor was there any rush to dump Thane shares. (2 Tr. 212.)

Fifth, at least as reflected in internet bulletin board postings, the fact of non-

---

11. There is little doubt that Thane stock would not meet the tests for an efficient market under *Cammer*. Volume was relatively modest after the merger. For nearly a month, Thane had only one or two market makers. Thane was not followed by any analysts. Thane did not qualify for using SEC Form S–3. The only *Cammer* factor present to any significant degree is the empirical fact that the stock reacted to some events, such as earnings reports.

12. The fact that the stock dropped about the same percentage as the quarter vs. quarter earnings drop is purely coincidental.

13. As Miller testified, "[a]ny idiot" can tell where a stock trades by simply looking. (Miller Depo., p. 60.) Cornell characterized the fact as "open and obvious to the market as soon as Thane began trading." (Cornell Decl., ¶ 23.)

14. The parties stipulated to this fact in the Pre–Trial Conference Order (¶ 5(g)).

listing was known fairly promptly to those who followed the Raging Bull website. (Ex. 22, *e.g.,* Msg. 261, May 25, 2002.)

As discussed above, Preston contended that price was not a reliable indicator because the market makers were interested, or biased, because they had an eye on acting as investment bankers for the secondary offering which Thane contemplated. There are two difficulties with this theory. First, there is no evidence that the market makers manipulated the stock, and Preston so conceded. Second, the market maker serves only to match buy and sell orders, and has no separate duty, as a specialist would, to keep an orderly market or otherwise stabilize prices. (2 Tr. 338.)

Thus, the question is what the Court is to make of Thane's trading history in the days following the merger. For 19 days, until June 11, 2002, the stock traded at or above its imputed price as of the merger, $7.00,[15] and even rose to $8.50. The Court agrees with Preston that because of the characteristics of Thane's stock, one cannot pinpoint when any given piece of information would be impounded by the stock. Nevertheless, the Court finds by a preponderance of the evidence that the period prior to June 11, 2002 was adequate time to impound the fact of the non-listing in the stock price, but the stock failed to react. This negates a finding of materiality, and confirms the view that the Court's finding of marginal materiality in the abstract was overly generous.

\* \* \* \* \* \*

In view of the Court's findings on the threshold determinations of misrepresentation and materiality, there is no need to address loss causation, the liability of the individual defendants, or the various affirmative defenses which Thane has advanced.[16]

### IV. *Findings of Fact and Conclusion of Law.*

Based on the foregoing, the Court makes the following findings of facts and conclusions of law.

#### A. *Findings of Fact.*

1. The Prospectus did not contain a false statement with regard to whether Thane would list its stock on the NMS immediately following the merger of Thane and Reliant.

2. Assuming the Prospectus could be read in a manner to support the conclusion that a false statement had been made with regard to listing, the statement was not material.

#### B. *Conclusions of Law.*

1. The Court has jurisdiction over this action. 15 U.S.C. § 77v; 28 U.S.C. § 1331.

2. Neither Thane nor the individual defendants violated Section 12(a)(2) of the 1933 Securities Act.

Thane is directed to submit a proposed judgment in conformance with this Memorandum.

---

**15.** Plaintiffs assert that the imputed price was $6.89; defendants assert it was $6.99. The Court uses the $7.00 for simplicity.

**16.** The Court notes Thane's Request for Judicial Notice, filed April 12, 2005. The Court is not certain of the significance of the statement by plaintiffs' counsel to the effect that Thane's price is meaningless. In any event, the Court need not consider the Request in light of its decision on the threshold issues on the basis of the trial record.