# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HOWARD MILLER, on behalf of
himself and all others similarly
situated,
                          *Plaintiff,*

              and

JOSEPH J. MILKOWSKI,
              *Plaintiff-Appellant,*

              v.

THANE INTERNATIONAL, INC.;
WILLIAM F. HAY; DENISE DUBARRY-
HAY; KEVIN J. MCKEON; MARK
TAYLOR,
              *Defendants-Appellees.*

No. 09-55474

D.C. No.
8:03-cv-01031-JVS-
SGL

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
May 6, 2010—Pasadena, California

Filed August 9, 2010

Before: Diarmuid F. O'Scannlain and Richard C. Tallman,
Circuit Judges, and Frederic Block, Senior District Judge.*

Opinion by Judge O'Scannlain

*The Honorable Frederic Block, Senior United States District Judge for
the Eastern District of New York, sitting by designation.

11265

## COUNSEL

Joel C. Feffer, Harwood Feffer LLP, New York, New York, argued the cause and filed the briefs for the plaintiffs-appellants. Daniella Quitt, Harwood Feffer LLP, New York, New York, and Lionel Z. Glancy, Glancy Binkow & Goldberg LLP, Los Angeles, California, were also on the briefs.

Daniel J. Tyukody, Orrick, Herrington & Sutcliffe LLP, Los Angeles, California, argued the cause and filed the brief for the defendants-appellees. Michael C. Tu and Jason L. Krajcer, both of Orrick, Herrington & Sutcliffe LLP, Los Angeles, California, were also on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a material misrepresentation in a prospectus caused actionable loss to shareholders when the

price of the company's stock did not decline in the weeks immediately following disclosure of the correct information.

I

A

Section 12(a)(2) of the Securities Act of 1933 imposes civil liability on "any person who . . . offers or sells a security . . . by the use of any means or instruments . . . in interstate commerce . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77*l*(a)(2). Accordingly, "to prevail under Section 12(a)(2), a plaintiff must demonstrate (1) an offer or sale of a security, (2) by the use of a means or instrumentality of interstate commerce, (3) by means of a prospectus or oral communication, (4) that includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading" by "any person." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 885 (9th Cir. 2008), *amending* 508 F.3d 910 (9th Cir. 2007). The Act defines "person" to include individuals and corporations. 15 U.S.C. § 77b(a)(2). Additionally, "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Section 12(a)(2)] shall also be liable jointly and severally with and to the same extent as such controlled person." *Id.* § 77o.

Section 12 liability may be avoided by way of an affirmative defense of lack of loss causation. The statute provides that if a person "proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication . . . not being true or omitting to state a material fact . . . then such portion or amount . . . shall not be recoverable." 15 U.S.C. § 77*l*(b). Consequently, "[a] Section 12 defendant is

liable only for depreciation that results directly from the misrepresentation at issue." *Miller*, 519 F.3d at 892.

B

With the relevant statutory framework in mind, we turn now to the facts of this case. In November 2001, defendant Thane International, Inc. ("Thane"), a company that markets consumer products through homeshopping channels, infomercials, and other similar means, and Reliant Interactive Media Corp. ("Reliant") agreed to merge. The merger agreement provided for Reliant shareholders to receive shares of Thane for their shares of Reliant. The "imputed merger price"—the value of Reliant stock each Reliant shareholder exchanged for each Thane share—was approximately $7.00. Significantly, the prospectus Thane filed with the Securities and Exchange Commission ("SEC") stated that Thane stock, which had not been publicly traded previously, was "approved for quotation and trading on the NASDAQ National Market upon completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share." Nevertheless, after the merger was consummated on May 24, 2002, Thane shares commenced trading not on the NASDAQ National Market System ("NMS"), but on the NASDAQ Over-the-Counter Bulletin Board ("OTCBB").

In the nineteen days (twelve trading days) between May 24 and June 11, 2002, Thane's shares traded between $8.50 and $7.00, above the merger price that Reliant shareholders had paid. On June 24, 2002, however, the stock closed at $6.00. The next day Thane reported disappointing earnings for the fiscal year, and the stock closed at $5.25. It soon thereafter dropped below $5.00, never to rise again above that minimum price for listing on the NMS.

On August 14, 2002, Thane announced further disappointing quarterly earnings, partly caused by a slump in the industry. It also reported that it had originally delayed listing on the

NMS in order to time it with a secondary public offering, but that recent business developments had put listing on the NMS on hold. Thane shares tumbled to $1.95 by August 16, 2002. In February 2004, Thane bought out existing shareholders at a price of $0.35 per share.

C

In September 2002, a class of individual Reliant investors who acquired shares of Thane in the merger ("investors") filed suit against Thane and four of its executives (collectively, "Thane") in federal district court, alleging violation of section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2), and control person liability under section 15 of the Securities Act of 1933, *id.* § 77o, and seeking rescission of the merger, recovery of damages, and fees. Specifically, the investors alleged that Thane's pre-merger prospectus contained materially misleading representations because it implied that Thane shares would list on the NMS.

After certifying the investors' class and conducting a three-day bench trial, the district court held that Thane did not violate section 12(a)(2). *Miller v. Thane Int'l, Inc.*, 372 F. Supp. 2d 1198 (C.D. Cal. 2005). The court found that the prospectus did not contain misleading representations, *id.* at 1205-06, and that even if it did, any misleading representations were not material because Thane's stock price did not depreciate below the merger price after the market became aware of the truth, *id.* at 1208-11.

In a prior appeal, we reversed, ruling that the district court clearly erred. *Miller*, 519 F.3d at 892 ("*Miller I*"). In our view, the prospectus contained statements that, although literally true, constituted misleading representations regarding where Thane stock would list. *Id.* at 885-88. Moreover, we held that those representations were material because a reasonable investor would have wanted to know that Thane stock would be listed on the OTCBB instead of the NMS in light

of the advantages associated with the latter market. *Id*. at 888. Even though there were materially misleading representations, however, we recognized that Thane could still prevail by establishing the affirmative defense of lack of loss causation. *See* 15 U.S.C. § 77*l*(b). "Without expressing any opinion as to the strength of [Thane's] argument," we "remand[ed] to the district court to address the issue of loss causation in the first instance," and to conduct other proceedings as appropriate. *Miller I*, 519 F.3d at 892-93.

On remand, the district court granted Thane's Motion for Judgment on Loss Causation. The district court observed that there could be no loss as long as Thane's stock price remained at or above the price of $7.00 that the investors had paid for the stock in the merger and that, consequently, there could be no loss causation if the stock price did not drop below $7.00 after reacting to the nonlisting on the NMS. The stock remained at or above that price for nineteen days. Accordingly, the district court focused on whether the stock price "impounded," *i.e.*, absorbed,[1] the nonlisting on NMS in this nineteen-day period. It held that Thane had carried its burden to show that the stock did so. The investor class timely appealed.

## II

In this second appeal, the investors advance two arguments that the district court erred as a matter of law in finding an absence of loss causation.

---

[1] The word "impound" is used in securities law as a synonym for "absorb." *E.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 275 (2d Cir. 1993) (Winter, J., dissenting); Chester S. Spatt, Chief Econ. & Dir., Office of Econ. Analysis, SEC, Keynote Address at the Wilton Park Conference on Capital Flows and the Safety of Markets: Volatility, Price Discovery and Markets (Nov. 10, 2006), *available at* http://www.sec.gov/news/speech/2006/spch111006css.htm.

A

The investors first argue that the district court's award of judgment to Thane on loss causation is foreclosed by *Miller I*. In their view, our holding in the investors' favor on materiality forecloses an award of judgment to Thane on loss causation.

**[1]** But loss causation and materiality are different concepts in the statutory scheme. Indeed, the statute provides a loss causation defense even when there are materially misleading representations. 15 U.S.C. § 77*l*(b). If a ruling on materiality foreclosed an affirmative defense of loss causation, that affirmative defense would be, as Thane correctly recognizes, "a nullity."

**[2]** Moreover, the materiality inquiry concerns whether a "reasonable investor" *would* consider a particular misstatement important. *Miller I*, 519 F.3d at 889 (discussing reasonable investor test for materiality in a section 12(a)(2) claim); *see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). It is hypothetical and objective. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). By contrast, the loss causation inquiry assesses whether a particular misstatement *actually* resulted in loss. *Miller I*, 519 F.3d at 892. It is historical and context-dependent. *See Lane v. Page*, 649 F. Supp. 2d 1256, 1297 (D.N.M. 2009) (contrasting ex post causation and ex ante materiality assessments). In any event, our remand to determine loss causation "in the first instance" would not have made sense if a particular ruling on loss causation were foreclosed. *Miller I*, 519 F.3d at 892.

*In re Gilead Sciences Securities Litigation*, 536 F.3d 1049 (9th Cir. 2008), is fully consistent with this well-established framework. In that case, we reversed the dismissal of a securities claim, rejecting the district court's view that a temporal gap between a misrepresentation and a drop in stock price rendered loss causation per se implausible. *Id.* at 1058. Rely-

ing on an observation in a prior case on materiality, we explained that markets are sometimes not immediately responsive to misrepresentations. *Id.* (citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)). The investors argue that such reliance establishes that our ruling in *Miller I* on materiality forecloses the district court's finding on loss causation. But that two inquiries are related does not mean that they are the same.

**[3]** The investors contend that, even if materiality and loss causation are different concepts, the district court's decision repeats verbatim the same reasoning we rejected when we ruled on materiality. But we did not reject the district court's reasoning that Thane stock prices were reliable even though the market was inefficient, which is what we now review. Rather, we rejected the district court's reasoning that historical stock prices are relevant to the reasonable investor test, which focuses on hypothetical, not actual, investors. We did not comment on the reliability of Thane's stock prices, other than to state what is undisputed, namely, that the stock traded in an inefficient market. *Miller I*, 519 F.3d at 888.

B

The investors next challenge the district court's reliance on Thane's stock prices. They argue that such reliance was inappropriate in the absence of market efficiency as defined in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

**[4]** *Cammer* outlined a test for market efficiency in the context of a section 10(b) securities fraud class action. To prevail under section 10(b), a plaintiff must show he justifiably relied on the alleged misrepresentation. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999) (citing 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5).[2] In order to ease the bur-

---

[2] Justifiable reliance is not an element of the cause of action at issue here. 15 U.S.C. § 77*l*(a)(2).

den of showing reliance for each member in a plaintiff class, which is necessary to obtain class certification, courts have presumed reliance when there is "fraud on the market," *i.e.*, the whole market is deceived by a misrepresentation such that "[m]isleading statements . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241-42. A plaintiff establishes fraud on the market by demonstrating that a security is actively traded in an "efficient market," in which prices immediately reflect all publicly available information. *Id.* at 246-48. *Cammer* sets out five well-recognized factors "designed to help make the central determination of efficiency in a particular market." *Binder*, 184 F.3d at 1065. There is no dispute that the *Cammer* test, which sets a high bar, is not met in this case. We must decide, therefore, whether stock price evidence may be used in a loss causation assessment when the market for a stock is not *Cammer*-level efficient.

**[5]** We hold that it may. The absence of *Cammer* efficiency does not mean that prices are unreliable. *Cammer* efficiency, by definition, exists when the release of financial information results in an "immediate response" by the market. *Cammer*, 711 F. Supp. at 1287. But an *immediate* response is not required for loss causation. Rather, the loss causation inquiry requires only a *full* response to the misrepresentation —one that is enough to assess whether the misrepresentation caused the plaintiffs' loss. Significantly, a full response may occur in a market that is not *Cammer* efficient because "[e]ven an 'inefficient' market price is objective and contemporaneous with events," "chang[ing] in response to news, including statements by the [principals]." *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1130 (7th Cir. 1993).

**[6]** Indeed, the *Cammer* test is not appropriate for assessing loss causation. That test was developed in support of a judicial presumption allowing plaintiffs to avoid a significant obstacle in certifying a class in securities fraud litigation. Due process concerns require that class certification meet rigorous

standards in securities cases. *See Unger v. Amediys Inc.*, 401 F.3d 316, 320, 322 (5th Cir. 2005) ("Because this inquiry can prove decisive for class certification, and because, given the realities of litigation costs, certification can compel settlements without trial, courts have frequently applied rigorous, though preliminary, standards of proof to the market efficiency determination."). The *Cammer* test's high bar is one such rigorous standard. But the same high bar is inappropriate to determine loss causation, where due process concerns regarding class certification do not exist.

No court has applied *Cammer* to loss causation, nor even to any area other than class certification, as the investors admit. Quite the contrary, the Second Circuit abstained from a *Cammer*-like inquiry in *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336 (2d Cir. 1987). That court relied on stock price evidence without assessing market efficiency in order to affirm an award of summary judgment to defendants who had raised the affirmative loss causation defense. *Id.* at 341-42. In fact, the *Akerman* court relied on price evidence despite recognizing that the stock at issue traded in a "thin market," *i.e.*, an inefficient market. *Id*. at 343. Although *Akerman* predates *Cammer*, it postdates *Basic*, which instituted the type of judicial inquiry into market efficiency of which *Cammer* is but one example.

**[7]** We are persuaded by *Akerman* and follow it. Accordingly, we decline to extend *Cammer* to loss causation. In so doing, we reject a per se rule that it is inappropriate to rely on stock prices in an inefficient market to determine loss causation.

### III

The investors also contend that the district court improperly found that Thane's stock price impounded the failure to list on the NMS before it fell below the merger price.

A

The investors argue that our standard of review of the district court's finding should be de novo. We disagree.

The loss causation inquiry is not a question of law reviewed de novo because it involves "the application of a legal standard to a particular set of facts." *TSC Indus.*, 426 U.S. at 450. Indeed, loss causation determinations involve assessments that are "peculiarly ones for the trier of fact" because they require drawing "inferences . . . from a given set of facts." *Id.* at 450. We have held that such determinations—whether classified as questions of fact or as mixed questions of law and fact—are reviewed for clear error. *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981) (holding that materiality, scienter, and reliance determinations are reviewed for clear error). Accordingly, we do so here. We will not reverse unless we have "a definite and firm conviction that a mistake has been committed." *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 576 (9th Cir. 1995).

B

Turning to the merits, the question is whether the district court clearly erred in holding that Thane established the absence of loss causation. Because the stock price movements are undisputed, we focus on whether the district court clearly erred in finding that the Thane stock price could impound the fact of listing on the OTCBB instead of the NMS in the nineteen-day period before the price dropped below the merger price the investors paid for the stock.

[8] The record contains substantial evidence supporting the district court's finding. Thane's expert stated that Thane's stock price could and did impound information about Thane during this nineteen-day period, including the listing on the OTCBB, which was disseminated on Internet bulletin board postings even though no analysts covered Thane. The district

court found this expert credible, and we are extremely deferential to credibility determinations. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1980). The investors' best challenge to the expert's credibility is that he testified in favor of disregarding prices in an inefficient market in *Furtherfield Partners, L.P. v. Perelman*, 2002 WL 32151542 (Del. Ch. Oct. 1, 2002). But we see no reason to overturn the district court's credibility finding on that basis: *Furtherfield* involved a "change of control" transaction and it is well-established that there are "control premiums" not reflected in the price of an individual share for blocks of shares that provide control of a company. The investors also argue that the fact that the stock traded on low volume, a mere 55,300 shares, in the nineteen days before it dropped below the merger price undermines the expert's conclusion. Low volume, however, does not necessarily indicate an unreliable market price. Rather, it could indicate that the market price is in equilibrium because neither buyers nor sellers believe they can profit by acting. In fact, the investors' own account supports this version of events: they stated that they decided to hold on to their shares for investment reasons, not because low volume prevented them from selling their shares.

In any event, even the investors' expert admitted that Thane's stock price could absorb information. We recognized as much in *Miller I* when we said that Thane's stock price slump in August "was compounded by the company's failure to find and market the 'hit' product it had hoped to find." 519 F.3d at 883-84. Moreover, the stock price "tumbled" approximately forty-six percent in response to the August 2002 earnings report, which paralleled the identical percentage drop in earnings compared to the same quarter in the prior year, *id.*, and the difference between listing on the OTCBB instead of the NMS is simpler to decode than an earnings report, as even one of the investors admitted.

The investors argue that this August 2002 earnings report disclosed additional information about the misleading repre-

sentation and management's integrity, namely that management "intentionally" did not list on the NMS. Although the investors do not spell out their position, they appear to argue that focusing on the changes in price in the first nineteen days is inappropriate because some of the truth regarding the misleading representation was not publicly available until the August 2002 earnings report.

The August 2002 earnings report, however, reiterated information that was obvious immediately after the merger, namely, that Thane was not going to be listed on the NMS because of market conditions. Even the investors' expert testified that the market was aware of Thane's nonlisting at the outset of the merger, long before the August 2002 earnings report, and it was obvious that Thane could not list on the NMS in August because its stock price was below the $5 minimum. Moreover, the August 2002 earnings report is not, as investors argue, a "mea culpa" that undermined management's integrity for the first time. That integrity was undermined, if at all, by the failure to list on the NMS. The earnings report did not provide evidence that such failure, involving a decision not to list even though Thane's stock was approved to do so, was any more "intentional" than it had been in the days immediately subsequent to the merger.

It is true that listing on the NMS is superior to listing on the OTCBB, at least according to our decision in *Miller I*, 519 F.3d at 888-92, but that is irrelevant. The question at issue here is whether listing on the OTCBB instead of the NMS actually caused the investors' losses. The investors ask us to reason from hypothetical and expected consequences. But predictions are not proof of what actually happened. The investors' own expert testified that listing on the OTCBB instead of the NMS would not necessarily reduce Thane's stock price.

[9] In light of the evidence of impoundment before the district court and despite the investors' detailed arguments

regarding other evidence, we do not have "a definite and firm conviction that a mistake [was] committed" when the district court found that Thane's stock price impounded information about the nonlisting on the NMS before it fell below the merger price that investors paid for it. *Exxon Co.*, 54 F.3d at 576.

### IV

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.