**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HOWARD MILLER, on behalf of
himself and all others similarly
situated; JOSEPH J. MILKOWSKI,
          *Plaintiffs-Appellants,*

          v.

THANE INTERNATIONAL, INC.;
WILLIAM F. HAY; DENISE
DUBARRY-HAY; KEVIN J. MCKEON;
MARK TAYLOR,
          *Defendants-Appellees.*

No. 05-56043

D.C. No.
CV-03-01031-JVS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
May 9, 2007—Pasadena, California

Filed November 26, 2007
Amended March 18, 2008

Before: Barry G. Silverman, Kim McLane Wardlaw, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

Joel C. Feffer and Daniella Quitt, Wechsler Harwood LLP, New York, New York, and Lionel Z. Glancy and Peter A. Binkow, Glancy Binkow & Goldberg LLP, Los Angeles, California, for the plaintiffs-appellants.

Daniel J. Tyukody and Michael C. Tu, Orrick, Herrington & Sutcliffe LLP, Los Angeles, California, for the defendants-appellees.

**ORDER**

The opinion filed November 26, 2007 and published at 508 F.3d 910 is superceded by the amended opinion below.

The panel has voted to deny Appellees' Petition for Rehearing and Suggestion of Rehearing En Banc.

The full court has been advised of the Suggestion of Rehearing En Banc, and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The Petition for Rehearing and Suggestion of Rehearing En Banc are **DENIED**. No further petitions for rehearing may be filed.

---

## AMENDED OPINION

WARDLAW, Circuit Judge:

Class plaintiffs appeal the district court's judgment, following a bench trial, in favor of Thane International, Inc. and its officers and directors (collectively, "Thane International") on plaintiffs' action brought under Section 12(a)(2) of the Securities Act of 1933 (the "Act"), 15 U.S.C. § 77l(a)(2) and under Section 15 of the Act, 15 U.S.C. § 77o, alleging control person liability against individual defendants. We must decide whether Thane International misrepresented to investors that it would list its shares on the NASDAQ National Market System ("NASDAQ"), and if so, whether those misrepresentations were material. The district court answered "no" to both questions. We have jurisdiction under 28 U.S.C. § 1291. We hold that the district court clearly erred when it found that Thane International did not misrepresent that it would list the merged company's shares on the NASDAQ. We also hold that these misrepresentations were material. We therefore reverse and remand for further proceedings.

### I.  Factual and Procedural Background

This appeal arises out of a merger transaction between Reliant Interactive Media Corporation ("Reliant"), a publicly

traded corporation, and Thane International, a privately held corporation. Reliant and Thane International executed an agreement and plan of merger on November 21, 2001, which was amended on December 6, 2001. Under the terms of the agreement, Reliant shareholders would receive 0.3049459 shares of Thane International common stock for each share of Reliant common stock surrendered upon completion of the merger. A wholly owned subsidiary of Thane International would merge with and into Reliant. The separate corporate existence of the subsidiary would cease, and Reliant would continue as the surviving corporation. Reliant would then become a wholly owned subsidiary of Thane International. Premerger, Reliant stock traded on the Over-the-Counter Bulletin Board ("OTCBB"), while Thane International's stock was not publicly traded.

On January 3, 2002, Thane International filed a combined proxy statement and prospectus (the "Initial Prospectus"), as part of a Registration Statement on Form S-4, with the Securities and Exchange Commission ("SEC"). The stockholder letter accompanying the Initial Prospectus stated that, as a condition to the merger, Thane International shares would be listed for trade on the NASDAQ, or another national exchange:

> It is a condition to the merger that the shares of Thane common stock to be received by stockholders of Reliant in connection with the merger be quoted or listed on the NASDAQ national market or a national securities exchange.

The Registration Statement was amended on February 21, 2002, March 29, 2002, April 23, 2002, and finally, on April 26, 2002, at which point the SEC declared it effective (the "Final Prospectus"). In the meantime, by letter dated April 9, 2002, NASDAQ notified Thane International that its shares were approved for listing on the NASDAQ.

The Final Prospectus omitted the express listing condition found in the Initial Prospectus. Although there are several references to listing the merged company's stock on the NAS-DAQ sprinkled throughout the Final Prospectus, those references contained literal representations that the merged company's shares had been approved for trading on the NAS-DAQ, and not that the shares were actually listed on the NAS-DAQ. For example, the cover page of the Final Prospectus states:

> The shares of Thane common stock to be received by stockholders of Reliant in connection with the merger have been approved for quotation and trading on the NASDAQ National Market upon completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share.

Under the heading "Reliant's Reasons for the Merger," the Prospectus represents:

> The combined company is expected to meet the initial listing requirements of the NASDAQ National Market, which would provide the Reliant stockholders with greater liquidity than they have with Reliant common stock trading on the over-the-counter market.

Under the heading "Per Share Market Price Information," the Prospectus informed investors:

> The Thane common stock to be issued in connection with the merger has been approved for quotation and trading on the Nasdaq National Market upon the completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share.

In the Final Prospectus's section on "QUESTIONS AND ANSWERS ABOUT THE MERGER," the hypothetical investor asks, "Will Reliant continue as a public company if the merger agreement is approved?" The hypothetical investment advisor replies:

> No. Reliant will become a wholly-owned subsidiary of Thane upon the completion of the merger, and Reliant stockholders will become holders of Thane common stock. Thane has received approval for quotation and trading of its common stock on the Nasdaq National Market upon completion of the merger, subject to Thane's compliance with the minimum bid price requirements of $5.00 per share.

The Final Prospectus also included a copy of the Merger Agreement. Section 6.5(b) of the Merger Agreement discussed Thane International's covenant to secure the NASDAQ listing:

> Thane shall use commercially reasonable efforts to cause its outstanding Thane Common Stock immediately after the Merger to be approved for quotation on the Nasdaq National Market System or, in Thane's reasonable discretion another national securities exchange, subject to official notice of issuance, as promptly as practicable after the date hereof, and in any event prior to the Effective Time.

Thane International was required to "compl[y] in all material respects with all covenants" as a condition precedent to Reliant's obligation to consummate the merger. In the April 9, 2002 letter, NASDAQ notified Thane International that it had approved Thane International's listing application. However, in April 2002, members of Thane International's Board of Directors met with their investment bankers, who advised the Board that shareholder value would be maximized if Thane International did not list its common stock on the NAS-

DAQ immediately after the merger, but instead waited to list once a secondary offering of shares was completed. According to William Hay, Thane International's Chairman and Chief Executive Officer, the secondary offering was to be completed as early as mid-July, approximately six weeks after the merger was consummated. During those six weeks, the bankers recommended that Thane International trade its shares on the OTCBB.

On May 20, 2002, Reliant's shareholders approved the merger, which was consummated on May 24, 2002. Thane International stock commenced trading that day over the OTCBB.

Thane International shareholders experienced a wild ride. Between May 24 and June 11, 2002, the reported share price ranged between $8.50 and $7.00.[1] The stock closed at $6.00 on June 24, 2002. Thane International reported its Fiscal Year 2002 earnings on June 25, 2002, and the stock closed that day at $5.25. On June 28, 2002, Thane International's closing price sunk below $5.00 per share, and never again closed above $5.00.

On August 14, 2002, Thane International announced its quarterly earnings in its 10-Q filing with the SEC. The results were disastrous, with earnings falling 46 percent over the same quarter the previous year. Apparently, there was a general slump in the industry about this time. This was compounded by the company's failure to find and market the "hit" product it had hoped to find. Thane International's flagship product, an exercise machine called the "AB-Doer," was not flying off the shelves as it once had. The 10-Q stated:

---

[1] Plaintiffs calculate the "merger price"—the value of Reliant stock each Reliant shareholder exchanged for each Thane International share they received as part of the merger—at $6.99 per share, while defendants calculate it at $6.89 per share. We agree with the district court that resolution of this dispute does not affect the outcome of this case.

> In May and June of [2002], we met with our invest-
> ment bankers to discuss an underwritten public
> offering of our common stock. Our investment bank-
> ers advised us that we could potentially obtain more
> favorable pricing for the public offering if we imple-
> mented our move to the NASDAQ National Market
> in conjunction with the underwritten [secondary]
> public offering. Over the course of June and July we
> have been preparing for the public offering, but we
> have recently concluded that present market condi-
> tions are no longer favorable for an underwritten
> public offering of common stock. As such, we are
> currently evaluating the listing of our common stock
> on a national market.

Thane International shares tumbled on the news, closing at
$1.95 on August 16, 2002.

In February 2004, Thane International completed a "going-
private" transaction in which all Thane International share-
holders were bought out at $0.35 per share. The shares had
never been listed on the NASDAQ.

Plaintiffs filed an action in the district court, alleging viola-
tions of Section 12(a)(2) of the Act, 15 U.S.C. § 77*l*(a)(2), for
misrepresentation in connection with a securities offering and
of Section 15 of the Act, 15 U.S.C. § 77*o*, for control person
liability against individual defendants William Hay; Denise
DuBarry-Hay, William Hay's wife and Thane International's
Chief Creative Officer; Kevin McKeon, Thane International's
Chief Financial Officer; and Mark Taylor, Thane Internation-
al's Chief Operating Officer and President. Plaintiffs allege
that the Final Prospectus contained material misstatements of
fact because it implied that Thane International shares would
be listed on the NASDAQ. The district court certified the
plaintiff class and confirmed Joseph J. Milkowski as the
named class representative.

The district court conducted a three-day bench trial. In a Memorandum of Decision, the district court held that the defendants had not violated Section 12(a)(2) of the Act for two reasons. *Miller v. Thane Int'l, Inc.*, 372 F. Supp. 2d 1198 (C.D. Cal. 2005). First, the district court found that the statements in the Final Prospectus regarding NASDAQ listing were not false or misleading. *Id.* at 1205-06. The court reasoned that the representations in the Final Prospectus were "literally true," in that they did not promise that Thane International shares would actually be listed on the NASDAQ. *Id.* at 1205. Rather, they merely represented that the shares would be or already had been *approved* or *qualified* for NASDAQ listing. *Id.* at 1204. The district court contrasted this representation with that determined to be false in *Blasdel v. Mullenix*, 356 F. Supp. 924, 925 (W.D. Okla. 1971), where the defendant had represented that the corporation's shares "would be listed" on the New York Stock Exchange. *Miller*, 372 F. Supp. 2d at 1205.

The district court also gave weight to the "drafting history of the Prospectus," finding it "reinforce[d]" his conclusion that the representations are literally true. *Id.* The district court noted that the Initial Prospectus contained an explicit condition that the merger would be completed only if Thane International listed its shares on the NASDAQ, but that the condition had been omitted from subsequent versions of the prospectus—including the Final Prospectus. *Id.* The district court concluded that dropping this condition demonstrated that Thane International did not actually promise to list its shares on the NASDAQ because "if a condition to list is eliminated, a reasonable investor would infer that there was no promise to list." *Id.*

Second, in the alternative, the district court held that even if the Final Prospectus contained false statements, those statements were not material. *Id.* at 1208-09. After hearing from both sides' experts, the district court considered the movement in Thane International's share price in the aftermath of

the merger as a probative indicator of materiality, even though it acknowledged that Thane International's shares did not trade on an efficient market. *Id.* at 1206-11. It held that because Thane International stock did not depreciate immediately following its listing on the OTCBB, even though the market had the ability to incorporate that information into Thane International's share price, the fact of nonlisting on the NASDAQ was not material. *Id.* at 1210-11.

Plaintiff class timely appealed.

## II.    Jurisdiction and Standard of Review

We have jurisdiction over final judgments of the district court under 28 U.S.C. § 1291. We review the district court's factual findings for clear error. Fed. R. Civ. P. 52(a); *SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003). As the Supreme Court stated in *TSC Industries, Inc. v. Northway, Inc.*,

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

426 U.S. 438, 450 (1976) (footnotes omitted).

### III. The Final Prospectus Contained Misleading Statements

Section 12(a)(2) of the Act imposes civil liability on

> [a]ny person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . . .

15 U.S.C. § 77*l*(a)(2). Thus, to prevail under Section 12(a)(2), a plaintiff must demonstrate (1) an offer or sale of a security, (2) by the use of a means or instrumentality of interstate commerce, (3) by means of a prospectus or oral communication, (4) that includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading. The district court noted, and the parties do not dispute, that only the fourth element is at issue here.

### A.

[1] We must therefore first determine whether the Final Prospectus contains false or misleading statements or omissions. We have recognized that statements literally true on their face may nonetheless be misleading when considered in context, warning:

> [A]n issuer's public statements cannot be analyzed in complete isolation. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."

*In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *see also Kaplan v. Rose*, 49 F.3d 1363, 1372 (9th Cir. 1994).

**[2]** "Section 12(a)(2) is a virtually absolute liability provision that does not require an allegation that defendants possessed scienter." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006) (internal quotation marks omitted); *see also Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995) ("It is understandable that Congress would provide [securities] buyers with a right to rescind, without proof of fraud . . . ."). Moreover, the purchaser need not prove reliance on the misrepresentations. *See Gustafson*, 513 U.S. at 576, 578.

## B.

The disputed statements in the Final Prospectus fall broadly into two categories. Certain representations assert that Thane International expects to have its shares "approved for quotation" on the NASDAQ once the merger is completed and the $5.00 threshold is met. Other representations indicate that Thane International has already secured such approval.

These statements are literally true. Thane International *did* make an effort to have its shares approved for NASDAQ listing, and Thane International *did* actually secure that approval on April 9, 2002, more than two weeks before it filed the

Final Prospectus. The disputed statements in the Final Prospectus by their terms promise no more than that.

**[3]** Yet, as the district court recognized, literal truth is not the standard for determining whether statements in a prospectus are misleading. We held in *Convergent Technologies* that " '[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.' " 948 F.2d at 512 (quoting *McMahan*, 900 F.2d at 579). Plaintiff class contends that the Final Prospectus implied that Thane International would *actually* list its shares on the NASDAQ. We agree with the Plaintiff class. The fair and reasonable implication an ordinary investor would derive from all the listing representations is that, after approval, the shares would be listed on the NASDAQ once the $5.00 threshold was met. The Final Prospectus represented that Thane International shares were expected to be approved for NASDAQ listing, and, in the next breath, that Reliant's shareholders could look forward to being "provide[d] . . . with *greater liquidity* than they have with Reliant common stock trading on the over-the-counter market" (emphasis added). Greater liquidity, *i.e.* greater ability to quickly trade at values reasonable in light of underlying supply and demand, was thus touted as a contemporaneous benefit of the merger. That representation surely suggests a commitment to listing the shares on the NASDAQ—once the $5.00 condition was met (which was immediately upon merger)—for approval alone would do absolutely nothing to increase a stock's liquidity. It is only once the stock actually trades on a national market that liquidity would increase. Moreover, that portion of the Final Prospectus favorably compares Thane International stock's future listing with Reliant's current listing on the OTCBB. The clear implication is that Thane International shares would not trade on the OTCBB, but would instead list on the NASDAQ, which is expressly invoked in the first part of the very same sentence.

The district court relied heavily on the "drafting history" in finding that the Final Prospectus was not misleading. It

observed that the Initial Prospectus made Thane International's listing on the NASDAQ market a condition to the merger, but that this condition was dropped by the time the Final Prospectus was accepted by the SEC and distributed to Reliant shareholders. The underlying premise of the district court's reasoning is that investors would read not only the effective Final Prospectus, but also previous drafts, would further connect the dots between various passages related to NASDAQ listing, and could *only* conclude that Thane International had not committed to the NASDAQ listing.

We reject that premise for two reasons. First, this premise overlooks the fact that by the time the Final Prospectus was issued, Thane International had already fulfilled the component of this condition over which it had any control: Thane International had applied for and received approval for NASDAQ listing. All that remained as a predicate for listing was for Thane International shares to reach a minimum bid price of $5.00. Second, investors are not generally required to look beyond a given document to discover what is true and what is not. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public."); *Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956) ("Availability elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus. Readiness and willingness to disclose are not equivalent to disclosure.") (internal quotation marks omitted).[2] We will not presume or require that investors independently seek out prior versions of SEC

---

[2]In the context of a "fraud on the market" Rule 10b-5 class action, where reliance is presumed based on the price of a stock, availability to the public of truthful information may be relevant to the extent the stock's price has not actually been skewed by any misrepresentations. However, in an action that does not involve the fraud on the market presumption, that truthful information is available elsewhere does not relieve a defendant from liability for misrepresentations in a given filing or statement. *See Apple Computer*, 886 F.2d at 1114-15.

filings or otherwise familiarize themselves with the "drafting history" of a prospectus. *Cf. Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1229 (7th Cir. 1980) ("Section 12(2) does not establish a graduated scale of duty depending upon the sophistication and access to information of the customer. A plaintiff under § 12(2) is not required to prove due diligence. All that is required is ignorance of the untruth or omission.") (citations omitted). Therefore, it was error to impute knowledge of the contents of the Initial Prospectus to Reliant shareholders who received the Final Prospectus.[3]

We also emphasize the "context and manner of presentation" of the references to NASDAQ listing. *Convergent Technologies*, 948 F.2d at 512 (quoting *McMahan*, 900 F.2d at 579). The NASDAQ is discussed no fewer than six times throughout the pages of the Final Prospectus, including on the cover page, the contents of which are closely regulated by the SEC. *See* Regulation S-K, 17 C.F.R. § 229.501(b). Indeed, § 229.501(b)(4) required Thane International to disclose whether "any national securities exchange or the Nasdaq Stock Market lists the securities offered." The listing on the national exchange is even cited as one of "Reliant's Reasons for the Merger." Read in context, these repeated references suggest nothing short of actual listing on the NASDAQ.

[4] The clear error standard is a high bar, but "the presumption of correctness that attaches to factual findings is stronger in some cases than in others. The same 'clearly erroneous' standard applies to findings based on documentary evidence as to those based entirely on oral testimony, but the presumption has lesser force in the former situation than in the latter."

---

[3]The district court relied on testimony from plaintiffs' expert witness that "people" and "the market" would have paid attention to and absorbed the shifting promise between the Initial and Final Prospectuses. Even accepting this testimony as true, that "people" and "the market" would have noticed the change does not make the statements themselves any less misleading.

*Bose Corp. v. Consumers Union of United States, Inc.*, 466
U.S. 485, 500 (1984) (citation omitted). The district court's
misrepresentation findings were based almost entirely on the
documentary record—evidence that is more amenable to eval-
uation by a reviewing court. Specifically, the relevant evi-
dence consisted primarily of the SEC filings themselves and
the witnesses' written declarations. After examining the docu-
mentary record, we have a "definite and firm conviction that
a mistake has been committed." *Easley v. Cromartie*, 532
U.S. 234, 242 (2001) (citation and internal quotation marks
omitted). Therefore, we hold that the Final Prospectus con-
tained false and misleading representations as to the NAS-
DAQ listing and that the district court clearly erred in finding
otherwise.

## IV. The Misleading Statements Were Material

The district court held in the alternative that even if Thane
International misrepresented that it would list its shares on the
NASDAQ, any such misrepresentations were immaterial. To
conclude that the misrepresentations were immaterial, the dis-
trict court reasoned that Thane International's shares did not
decline in value even after the market absorbed the fact that
Thane International shares were not trading on the NASDAQ.
Although it acknowledged that Thane International shares did
not trade on an efficient market, the district court found by a
preponderance of the evidence that those shares had the abil-
ity to incorporate the obvious fact of nonlisting into their
price.

The district court erred when it considered the movement
in share price of a stock that did not trade on an efficient mar-
ket to determine materiality under the circumstances of this
case. Therefore, its conclusion that Thane International's mis-
representations were immaterial is clear error.

[5] Thane International is liable under Section 12(a)(2) only
if the misrepresentations in the Final Prospectus were material

to the decision of voters to approve the merger. 15 U.S.C. § 77*l*(a)(2) (referring to a prospectus containing "an untrue statement of a material fact or omit[ting] to state a material fact . . . ."). The Supreme Court articulated the standard for materiality in securities actions in *TSC Industries*: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." 426 U.S. at 449.[4] Assessing materiality is a "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Id.* at 231-32 (quoting *TSC Indus.*, 426 U.S. at 449).

The district court received testimony from both sides' experts on the question of materiality. Testifying for Thane International, Bradford Cornell, Professor of Finance at the Anderson Graduate School of Management at the University of California, Los Angeles, minimized the importance investors attach to the market in which a company trades, concluding "value derives from the company itself and not where it trades." He also testified that liquidity is determined by a company's inherent characteristics,[5] not the market on which it trades. He generally regarded listing on the NASDAQ as a cosmetic benefit of secondary importance to investors who focus on a company's fundamentals.

---

[4]Though *TSC Industries* involved SEC Rule 14a-9, we have adopted its materiality standard in Section 12 actions. *See Casella v. Webb*, 883 F.2d 805, 807-08 (9th Cir. 1989).

[5]Cornell cited relevant factors such as a company's number of outstanding shares, its public float, market capitalization, analyst coverage, media coverage, number of institutional shareholders, and volatility.

On behalf of the plaintiff class, Candace Preston, founding member of Financial Markets Analysis, LLC, emphasized the benefits that accompany NASDAQ listing as compared to listing on the OTCBB. She declared that NASDAQ stocks generally enjoy greater liquidity, and thus reduced spreads,[6] leading to greater investor returns.[7] NASDAQ-listed shares are also exempt from state-by-state "Blue Sky" laws, which require companies offering securities to undergo burdensome registration processes in certain states in addition to the various federal registration requirements. This translates into lower compliance costs, more favorable terms for raising capital, and thus, all things being equal, higher earnings and share prices. NASDAQ-listed shares can also be purchased on margin, *i.e.* purchased with money on loan from a stockbroker. This can lead, all things being equal, to a larger investor base and higher returns.

Preston testified, and Thane International did not dispute, that institutional investors almost universally shun OTCBB stocks, which significantly cuts into the base of demand for those shares (thus depressing their price). Preston also testified that OTCBB stocks are not regularly quoted in financial publications like the *Wall Street Journal*, which further decreases their exposure to potential investors and decreases price transparency. She also explained that NASDAQ listing

---

[6]Stocks that are less liquid have greater "spreads" between the bid and ask prices, i.e. the difference between the price buyers are willing to pay and the price sellers are willing to accept. All things being equal, investors enjoy greater returns as the size of a stock's spread diminishes.

[7]The district court credited this testimony, but found that the statistical evidence demonstrated that NASDAQ listing conferred only a small average advantage for liquidity and spreads. It noted one study showing that for stocks switching from the OTCBB to the NASDAQ, the mean decrease in spreads was less than six cents per share, and the mean increase in trading volume was only around 20 percent. The district court also noted the study's finding that spreads fell for approximately 60 percent of the companies switching from the NASDAQ to the OTCBB, but that they actually rose for about 40 percent.

confers a degree of prestige on a stock because of that market's more rigorous listing standards.

[6] Whether a false promise to list shares on a national exchange like the NASDAQ can be a material omission appears to be a question of first impression in our or any of our sister circuits. At least two district courts have suggested that such a misrepresentation is material, however. In *Blasdel*, Mullenix told Blasdel that shares of his corporation would be traded on the New York Stock Exchange. 356 F. Supp. at 925. In fact, the shares were never listed there. *Id*. at 926. The district court concluded that this misrepresentation was material and that Mullenix had therefore violated Section 12 of the Act. *Id*. at 925, 927.[8]

In *KA Investments LDC v. Number Nine Visual Technology Corp.*, KA Investments bought 300 shares of Number Nine's preferred stock for $3 million. 2002 U.S. Dist. LEXIS 18690 at *4, Fed. Sec. L. Rep. (CCH) P92,024 (D. Mass. 2002). The purchase agreement stated as a condition that KA Investments could convert those shares into common stock. *Id*. at *4-5. "KA Investments' strategy was predicated on its ability to then trade Number Nine's common stock on the NASDAQ National Market, where the stock was listed as of March 31, 1999, or on some other comparable market." *Id*. at *5. Number Nine also represented that it was in compliance with all relevant NASDAQ listing requirements and that it had no reason to foresee that its shares might be delisted from the NASDAQ. *Id*. at *6. Subsequently, it emerged that Number Nine was not in compliance with NASDAQ's listing requirements and its shares were delisted. *Id*. at *14. Number Nine was given the option to instead list its shares on the NASDAQ Small Cap Market, but it declined to do so. *Id*. at *15 n.7.

---

[8]It is not clear whether shares of the corporation in *Blasdel* were traded on an exchange other than the New York Stock Exchange, or whether they were never listed on any exchange at all. Nevertheless, it is apparent that the district court attached significance to the promise to list the shares on a national exchange.

The district court found that Number Nine misrepresented its status with respect to NASDAQ listing. *Id*. at *34. It then stated: "Neither do the defendants seriously dispute that this misrepresentation concerned a matter of material interest to KA Investments, given its express plan to trade Number Nine's common stock." *Id*. The district court proceeded to discuss other elements of the plaintiff's Rule 10b-5 action, on the assumption that the materiality requirement was satisfied. *Id*. at *34-44.

**[7]** Here, the district court found that based on the evidence presented and without regard to the actual performance of Thane International's stock, the fact of NASDAQ listing was "marginally material." *Miller*, 372 F. Supp. 2d at 1208. We agree that Thane International's promise to list its shares on the NASDAQ was material. Even accepting as true all of Cornell's testimony, there is no factual dispute between the experts that NASDAQ listing carries objective benefits that directly and positively affect corporate earnings, investor returns, and a stock's pool of potential shareholders. Earnings benefit because NASDAQ-listed companies are not required to comply with the patchwork of Blue Sky laws adopted by the various states. Describing the burden imposed by Blue Sky compliance, SEC Chairman Arthur Levitt explained to the Senate Committee on Banking, Housing, and Urban Affairs:

> While securities markets today are global, issuers and securities firms still must register many securities offerings in 52 separate jurisdictions; satisfy a multitude of separate books and records requirements; and bear the substantial costs of compliance with the overlapping requirements.

*The Securities Investment Promotion Act of 1996: Hearings on S. 1815 Before the Senate Comm. on Banking, Housing, and Urban Affairs*, 104th Cong. 32 (1996); *see also* Therese H. Maynard, *The Uniform Limited Offering Exemption: How*

*"Uniform" is "Uniform?"—An Evaluation and Critique of the ULOE*, 36 Emory L.J. 357, 359 (1987) (noting that complying with both federal and Blue Sky requirements involves "substantial" costs and logistical challenges).

Exemption from Blue Sky registration is especially advantageous for a small company, like Thane International, for which fixed compliance costs will factor as a more significant expenditure. A small company unwilling or unable to pay to comply with a state's Blue Sky regulations cannot offer securities within that state, which adversely affects the company's ability to raise capital. *See* Rutheford B. Campbell, Jr., *The Impact of NSMIA on Small Issuers*, 53 Bus. Law. 575, 580 (1998) (noting "the drag on capital formation imposed by state blue sky regulations, especially as concerns small issuers").

**[8]** Investors also receive advantages because NASDAQ-listed shares have greater liquidity (as Thane International's Final Prospectus stated) and thus have smaller spreads, on average, than shares traded on the OTCBB. Larger spreads entail a larger built-in loss at the time a stock is purchased, which, all things being equal, makes that stock a less attractive investment. The district court found the difference minimal, noting that average spreads are only six cents higher on the NASDAQ than on the OTCBB, and that some stocks actually saw their spreads increase after switching to the NASDAQ. But pennies count in the world of investing,[9] and even if some stocks fare better on the OTCBB than the NASDAQ, the opposite more often holds.

**[9]** The evidence also compels the conclusion that NASDAQ listing attracts investors that would not invest in a bulletin board stock. We find particularly significant Preston's uncontested testimony that all but a "very limited number" of

---

[9]Especially for stocks, like Thane International, that trade in a relatively low price range.

institutional investors are prohibited, under their bylaws, from investing in stocks traded on the OTCBB. According to the New York Stock Exchange, 48.3 percent of the total corporate equities in the United States were owned by institutional investors in 2001, the year before the Final Prospectus was sent to Reliant shareholders.[10] Institutional investors control an enormous portion of investment dollars—dollars that could not flow into Thane International shares if they were listed on the OTCBB, thus slashing into the stock's base of demand.

[10] Three other facts suggest that NASDAQ listing may attract a larger pool of investors than listing on the OTCBB. First, NASDAQ-listed shares can be purchased on margin, while shares on the OTCBB cannot. Second, OTCBB shares are not regularly quoted in popular investment periodicals like the *Wall Street Journal*, which may decrease a stock's exposure to potential investors. Third, as Preston testified, NASDAQ listing lends a degree of prestige to a stock because it means the company has met that exchange's more rigorous listing standards. We find this third fact significant in the context of a company which, like Thane International, had not previously traded its shares publicly, so that investors were without an established track record to provide confidence in the company's prospects and management. Under these circumstances, the stamp of NASDAQ approval could very well provide some reassurance to potential investors.

[11] Here, Thane International's prospectus induced Reliant shareholders to vote for the merger in part because the "combined company [would meet] the initial listing requirements of the NASDAQ National Market, which would provide the Reliant stockholders with greater liquidity than they have with Reliant common stock trading on the over-the-

---

[10]*See* New York Stock Exchange, NYSEData.com Factbook: Holdings of Corporate Equities in the U.S. by Type of Institution, *available at* http://www.nysedata.com/nysedata/asp/factbook/viewer_edition.asp?mode=table&key=2673&category=12.

counter market." A reasonable Reliant shareholder would have wanted to know that in fact Thane International would not be listed on the NASDAQ, and would not enjoy the greater liquidity Thane International promised. The omission of this information "significantly altered the 'total mix' of information made available" at the time of the vote. *TSC Indus.*, 426 U.S. at 449. Certainly, Thane believed that fact was important in the total mix of information presented, or it would not have included the representation in the first place. We believe that reasonable minds cannot differ on the conclusion that Thane International's misrepresentations regarding NASDAQ listing were material to Reliant shareholders' decision to vote for the merger. Therefore, the district court clearly erred by concluding otherwise, particularly in light of the undisputed fact that the newly merged Thane International never did trade on an efficient market.

## V.  Loss Causation

A Section 12 defendant is liable only for depreciation that results directly from the misrepresentation at issue. *See* 15 U.S.C. § 77*l*(b). Because the district court found no misrepresentation, however, it did not reach loss causation. Thane International urges that we should affirm the district court's judgment because the district court's factual findings necessarily establish that there was no loss resulting from any material misrepresentations. Specifically, Thane International argues that the district court's finding that Thane International stock did not react during its first nineteen days of OTCBB listing supports a finding that its failure to list on the NAS-DAQ was not the direct cause of any loss of value.

**[12]** Without expressing any opinion as to the strength of this argument, we remand to the district court to address the issue of loss causation in the first instance, following the "general rule [that] 'a federal appellate court does not consider an issue not passed upon below.'" *Golden Gate Hotel Ass'n v. City & County of San Francisco*, 18 F.3d 1482, 1487

(9th Cir. 1994) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).

## VI.   Conclusion

Thane International's Final Prospectus misrepresented that Thane International shares would be listed on the NASDAQ, and, under the circumstances, that misrepresentation was material. We therefore remand to the district court with instructions to enter judgment in favor of the plaintiffs, to address loss causation, and to conduct further proceedings consistent with this opinion.

**REVERSED and REMANDED.**