**Arnold KREEK, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**WELLS FARGO & COMPANY, Wells Fargo Funds Management, LLC, Wells Fargo Funds Trust, Wells Fargo Distributors, Stephens, Inc., and Wells Fargo Bank, N.A., Defendants.**

No. C 08–01830 WHA.

United States District Court, N.D. California.

Aug. 20, 2009.

Deborah Clark–Weintraub, Elizabeth Rosenberg, Whatley Drake & Kallas LLC, Michael Robert Reese, Reese Richman LLP, New York, NY, for Plaintiff.

Gilbert Ross Serota, Jin H. Kim, Howard Rice Nemerovski Canady Falk, Jeremy Kamras, Attorney at Law, Thomas Octavian Jacob, Wells Fargo Law Department, San Francisco, CA, for Defendants.

## ORDER DISMISSING CLASS ALLEGATIONS ONLY

WILLIAM ALSUP, District Judge.

### INTRODUCTION

In this proposed class action, this is a motion to dismiss claims involving defendants' alleged violation of federal securities laws. Plaintiff investors assert that defendants Wells Fargo & Company and its affiliates violated Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934. On this motion to dismiss, defendants argue that plaintiffs' claims are untimely under the two-year statute of limitations and that the complaint fails to properly plead a violation of Rule 10b–5. This order finds that all putative class members were on inquiry notice more than two years before the action was filed. The statute of limitations for the *individual* claims was tolled by the filing of *Ronald Siemers v. Wells Fargo*. The *class* allegations, however, were not tolled by *Siemers*.

Accordingly, plaintiffs may continue this action as individuals but the class allegations must be dismissed. The complaint otherwise states a valid claim for relief. Defendants' motion to dismiss plaintiffs' individual claims is DENIED.

## STATEMENT

This is a putative class action that arises from allegations of false and misleading statements in violation of federal securities laws. Plaintiffs Edward Lee, Edward Arsenault, Emil De Bacco, Richard Hinton, Arnold Kreek, and Margret Macht are investors who purchased Wells Fargo Funds from November 4, 2000, through April 11, 2006, inclusive. Defendants Wells Fargo & Company and its affiliates (Wells Fargo Funds Management, LLC, and Wells Fargo Funds Trust) provide financial services to clients—such as banking, insurance, investments, mortgage, and consumer finance services.

Plaintiffs allege that defendant Wells Fargo & Company is the ultimate parent of all defendants named in the complaint. It was the ultimate beneficiary of the scheme to drive new investors into the Wells Fargo funds through the alleged kickback scheme. Defendant Wells Fargo Funds Management, LLC, is registered as an investment adviser under the Investment Advisers Act and is allegedly responsible for implementing the policies and guidelines for the funds at issue. Wells Fargo Funds Trust is allegedly the registrant of all the Wells Fargo funds for purposes of filing financials with the SEC.

Plaintiffs allege that Wells Fargo and its affiliates entered into secret revenue-sharing agreements with brokerages and selling agents who sold Wells Fargo Funds. Brokerages and selling agents received revenue when they steered their clients into Wells Fargo Funds to the exclusion of other funds better suited to their clients' interests. Defendants financed these improper kickbacks by charging hidden excessive fees to their clients, which fees should have instead been invested in the funds' underlying portfolio. These preexisting and ongoing revenue-sharing arrangements were not disclosed to investors at the time investors purchased Wells Fargo Funds.

From 2000 to 2006, plaintiffs each purchased shares in at least one of defendants' mutual funds. Annually, each fund issued a prospectus that contained a disclosure pertaining to the fund's "Fund—Objective—Principal Strategy," "Shareholder Fees" and "Annual Fund Operating," "Organization and Management of the Funds," and "Distribution Plan." A "Statement of Additional Information" (SAI) also was included with each prospectus that discussed the duties of the investment advisor, investment sub-advisors, administrators, distributor, and custodian and the fees to which they were entitled. The SAIs also provided information regarding defendants' shareholder-servicing plan and shareholder-servicing agents as well as its rule 12b–1 plan. In 2002, 2004, and 2005, supplemental information regarding "Additional Payments" was also included in the prospectuses. Plaintiffs allege that the prospectuses and SAIs, released from 2000 to 2006 were false and misleading in identical respects. Generally, those documents did not disclose the secret revenue-sharing agreements. Plaintiffs argue that if the kickback payments pursuant to the revenue-sharing agreements had been disclosed to investors at the time the investments were made, no reasonable investor would have invested in the funds.

This action is a sequel to a previous and heavily litigated action entitled *Ronald Siemers v. Wells Fargo,* C 05–04518–WHA, which was before the undersigned until it settled on a class-wide basis on August 3, 2007.

On April 4, 2008, the same counsel filed this action on behalf of different investors but assert the same theories as to all the Wells Fargo funds that were not certified in *Siemers*. Plaintiffs allege that the investment adviser and registrant adviser defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 by employing a revenue-sharing scheme which they intended to use to defraud plaintiffs; by disseminating materially false and misleading information through the instrumentalities of interstate commerce; that it profited from these unlawful fees that it charged plaintiffs; had actual knowledge of the misrepresentations and omissions of material facts; that plaintiffs did not have knowledge of the falsity of the misrepresentations or omissions; and that plaintiffs as a direct and proximate result of defendants' conduct were harmed. Plaintiffs also allege that Wells Fargo & Company violated Section 20(a) of the Exchange Act because it acted as a controlling person of the investment adviser and registrant adviser defendants; investment adviser and registrant advisor defendants violated Section 10(b) and Rule 10b–5; and as a direct and proximate result of investment advisor and registrant advisor's conduct, plaintiffs were harmed.

## ANALYSIS

### 1. LEGAL STANDARD.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. The Supreme Court has recently explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ibid.* All material allegations in the complaint as well as reasonable inferences to be drawn from them are accepted as true. But this does not apply to legal conclusions. Rather, courts must examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff.

Although materials outside of the pleadings should not be considered without converting the motion to dismiss to a motion for summary judgment, a district court may consider all materials properly submitted as part of the complaint such as exhibits. A district court may also consider documents to which the complaint specifically refers and whose authenticity is not questioned even if they are not physically attached to the complaint. A district court may take judicial notice of its own orders and of records in a case before it as well as other matters of public record that are properly subject to judicial notice. *Hal Roach Studios v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

In this case, this order involves a review of documents essential to the claim, documents specifically referred to in the complaint, documents already in the Court's files, and published reports regarding the payment of hidden brokerage fees by mutual fund companies including affiliates of defendants in this case.

### 2. STATUTE OF LIMITATIONS.

■ Claims for a violation of Section 10(b) and Section 20(a) of the 1934 Act must be brought within two years of discovery of the facts constituting a violation. 28 U.S.C. 1658(b)(1). "[E]ither actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim." *Betz v. Trainer Wort-*

*ham & Co., Inc.,* 519 F.3d 863, 869 (9th Cir.2008).

The Ninth Circuit uses the "inquiry-plus-reasonable-diligence" test to determine whether a statute of limitations begins running due to inquiry notice. This is a two-part objective test. *First,* a court must determine whether the plaintiff had inquiry notice of the facts giving rise to his claim. The *Betz* decision held that the facts constituting inquiry notice "must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion to incite the victim to investigate." *Id.* at 871. *Second,* a court must ask whether "the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Id.* at 876 (citation omitted). Under this standard, the defendant bears a considerable burden in demonstrating that the plaintiff's claim is time barred. A ruling as a matter of law is appropriate "only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Id.* at 877 (citation omitted).

## A. Inquiry Notice.

*In re American Funds Securities Litigation,* 556 F.Supp.2d 1100 (C.D.Cal. 2008), is directly on point. That decision dismissed a complaint involving an alleged violation of Section 10(b) as time barred after finding that the plaintiff investors were on inquiry notice of the defendant's alleged misconduct. The decision found that news articles, SEC press releases, and a prior complaint filed by other investors were sufficient to put the plaintiffs on inquiry notice. One such news article published by the Los Angeles Times, "focus[ed] on the activities of the defendants named in [that] case and on the same payments that [were] the center of their alleged wrongdoing." *Id.* at 1105–06. The article was held to establish "sufficient

suspicion of fraud to cause a reasonable investor to investigate the matter further because it report[ed] that one of the brokerages receiving such payments ... agreed to pay $50 million to settle SEC charges that it had received substantial hidden fees" from numerous companies in return for promoting their funds. *Ibid.*

The district court in *American Funds* also noted a prior complaint filed over two years before the complaint at issue and which alleged "a nearly identical scheme of wrongdoing against [d]efendants." The decision held that the prior complaint "when taken together with all of the other information in the public domain regarding investigations into" revenue sharing between mutual fund companies "would have put anyone giving reasonable attention to the subject on notice of the existence of a claim under the 1933 and 1934 Acts." *Id.* at 1109–10.

The facts in the present case are nearly identical to those in *American Funds.* This order takes notice of the NASD's June 2005 press release, the news articles which carried that press release, the prior decision in *Siemers,* and the December 2005 "Disclosure Statement" issued by Wells Fargo. These documents put plaintiffs on inquiry notice by December 2005. They were "sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion ... to incite the victim to investigate." *Betz,* 519 F.3d at 871.

Plaintiffs admit to the NASD's June 2005 press release in their complaint. The complaint alleges that as detailed in the NASD's press release the:

> NASD found that the [Wells Fargo Investments], most of which sold funds offered by hundreds of different mutual fund complexes, operated "preferred partner" or "shelf space" programs that provided certain benefits to a relatively

small number of mutual fund complexes in return for directed brokerage. The benefits to mutual fund complexes of these quid pro quo arrangements included, in various cases, higher visibility on the firms' internal web sites, increased access to the firms' sales forces, participation in "top producer" or training meetings, and promotion of their funds on a broader basis than was available for other funds. (Compl. ¶ 246). The press release further asserted that the fund complexes "use[d] assets of the mutual funds instead of their own money to meet the[se] revenue sharing obligations" (Wells Fargo Exh. A at 1). Contrary to plaintiffs' assertion, the release specifically stated that Wells Fargo Investments, an affiliate of Wells Fargo & Company, was fined $2,970,000 for its involvement in the scheme (*ibid.*). The story was carried by major media outlets including the *Los Angeles Times, Associated Press, Market Wire,* and *PR Newswire.*

Plaintiffs also rely upon Wells Fargo's December 2005 "Disclosure Statement" in their complaint. That document stated that Wells Fargo participated in revenue-sharing agreements and that the "compensation arrangements [were] in addition to the sales charges and fees that [were] disclosed in the fee tables, prospectuses and statements of additional information" (Compl. ¶ 247). According to the complaint, "Wells Fargo Investments admitted that it received the payments from the Wells Fargo Funds that are at issue in this Complaint, that said payments created potential conflicts of interest and that, finally, such payments were not disclosed in either the Wells Fargo Funds' prospectuses or statements of additional information" (*ibid.*). Other similarly situated investors in the *Siemers* case alleged that "the full extent of [d]efendants' conflicts of interests were revealed" when the disclosure statement was "publicly circulated" in December 2005 (Wells Fargo Exh. Y). More-

over, the complaint alleges this information under the heading "The Truth Begins to Be Disclosed." In relying on the disclosure statement in their complaint, plaintiffs have practically conceded that they were on inquiry notice as of December 2005.

Finally, plaintiffs allege that their complaint is premised on the *Siemers* action. The *Siemers* action affirms the finding that plaintiffs were on inquiry notice more than two years before the filing of this action. The first *Siemers* complaint was filed in November 2005 and contained substantially similar allegations of fraud against the same defendants as here. Contrary to plaintiffs' assertion, it alleged the same core allegations as here, including allegations of defendants' violation of Section 10b–5 of the 1934 Act and allegations of scienter (Wells Fargo Exh. Z). The *Siemers* complaint was first publicized in *PR Newswire* and the *Associated Press* on November 11 and was later carried at least 19 additional times by *PR Newswire* (Wells Fargo Exh. D–W). It was also filed with the SEC in December 2005 (Wells Fargo Exh. FF). As in *American Funds,* "when taken together with all of the other information in the public domain" regarding the revenue-sharing scheme, the previously-filed *Siemers* complaint "would have put anyone giving reasonable attention to the subject on notice of the existence of a claim" under the 1934 Act. *American Funds,* 556 F.Supp.2d at 1109–10.

## B. Reasonable Diligence.

With regard to the second prong of the test for inquiry notice, plaintiffs argue that what a reasonable investor should have known is particularly suited to a jury determination and that the issue of diligence is difficult to resolve as a matter of law. While these contentions are correct, the relevant question is "whether their application in this case on this record defeats the motion to dismiss." *American Funds,*

556 F.Supp.2d at 1110. In fact, there are numerous decisions where plaintiffs were found to be on inquiry notice as a matter of law on a motion to dismiss. *See, e.g., In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir.1996); *American Funds*, 556 F.Supp.2d 1100; *In re Infonet Servs. Corp. Sec. Litig.*, 310 F.Supp.2d 1106 (C.D.Cal. 2003); *DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209 (3rd Cir.2007).

In this case, the inquiry notice and reasonable diligence tests merge because of the level of detail that was disclosed by December 2005. As stated, the NASD action, press releases, and disclosure statement revealed that Wells Fargo affiliates had participated in revenue-sharing agreements paid from fund assets not earlier disclosed in its prospectuses or SAIs. This was and is the crux of the allegations in the complaint here and in *Siemers*. The public record by December 2005 contained information that not only put plaintiffs on notice of fraud, but also exposed how the revenue-sharing scheme worked. The fact that other similarly situated plaintiffs were able to file an identical action in *Siemers* by November 2005 affirms this order's finding that plaintiffs were on inquiry notice more than two years before the complaint was filed in April 2008. Thus, absent tolling, the two-year statute of limitations ran on these claims before this action was commenced.

### 3. TOLLING.

■ Plaintiffs argue that the statute of limitations was tolled by the filing of the *Siemers* complaint. This order finds that the statute of limitations was tolled with respect to the *individual* plaintiffs in this action. The statute of limitations was not tolled, however, for the *class* allegations.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the plaintiffs filed a class action suit with only eleven days left to run on the applicable statute of limitations. Class certification was later denied, and eight days after that a number of individual class members moved to intervene as individuals. The Supreme Court ruled that the filing of a class action tolled the statute of limitations for all plaintiffs who filed timely motions to intervene. In *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), the Supreme Court extended *American Pipe* tolling to all asserted members of the class who sought to file new but individual actions following a denial of class certification—not just to intervenors in the original class proceeding.

While the Supreme Court has not yet considered whether *American Pipe* tolling applies to subsequent *class* claims following the denial of class certification, the appellate courts have generally refused to extend the tolling doctrine in most circumstances. The Ninth Circuit considered this question in *Robbin v. Fluor Corp.*, 835 F.2d 213 (9th Cir.1987). It held:

> Robbin asserts that the policy considerations underlying the tolling doctrines of *American Pipe* and *Crown, Cork* should be extended to include class members who file subsequent class actions. This position has been squarely rejected by several courts ... We agree with the Second Circuit that to extend tolling to class actions "tests the outer limits of the *American Pipe* doctrine and ... falls beyond its carefully crafted parameters into the range of abusive options." We therefore affirm the district court's dismissal of *Robbin*'s class action.

*Ibid.* (citing *Korwek v. Hunt*, 827 F.2d 874 (2nd Cir.1987)). The reasoning, as stated by Korwek, was that putative class members may not "piggy-back one class action onto another and thus toll the statute of limitations indefinitely." *Id.* at 878.

In *Catholic Social Services, Inc. v. INS*, 232 F.3d 1139 (9th Cir.2000), the Ninth

Circuit again considered the question of whether *American Pipe* tolling applies to subsequent class claims following the denial of class certification. This time it cut out a narrow exception to *Robbin*. In *Catholic Social Services*, the plaintiffs in a prior action filed a class action claim. After the class had already been certified, Congress stripped federal courts of jurisdiction over the named plaintiffs in that action. A new class action was filed with named plaintiffs that met the new jurisdictional requirements. Even though the statute of limitations had run, the decision tolled the statute of limitations for the subsequent class action. The Ninth Circuit, however, re-affirmed *Robbin*. *Catholic Social Services* was careful to reiterate its holding that *American Pipe* tolling does not apply when the plaintiffs are "attempting to relitigate an earlier denial of class certification or to correct a procedural deficiency in an earlier would-be class." *Id.* at 1149.

Here, plaintiffs are attempting exactly what *Robbin* and *Korwek* foreclosed—they are attempting to relitigate an earlier denial of class certification in *Siemers*. *Korwek* is directly on point. That decision involved plaintiffs who had previously filed a lawsuit alleging a broad class. In the prior action, a class certification order had "drastically limited the scope of the class certified largely because of what it adjudged to be significant problems of manageability," among other reasons. In *Korwek*, those plaintiffs who were denied certification in the prior action filed a subsequent class action which asserted "claims virtually identical to those previously asserted in [the prior action] and name[d] nearly all of the same parties as defendants." The decision in *Korwek* held that the statute of limitations did not toll for the subsequent class action.

■ Here, as in *Korwek*, *Siemers* was filed as a broad class consisting of purchasers of more than seventy Wells Fargo mutual funds. *Siemers* eventually certified a narrower class consisting of only the purchasers of the mutual funds held by the lead plaintiff—three funds in all. In the present case, like in *Korwek*, a new group of lead plaintiffs are attempting to cure the deficiencies in the prior action. Plaintiffs seek to certify the same class that *Siemers* had already found inappropriate for certification. The similarities between the two actions are readily apparent. *First,* as in *Siemers*, the proposed classes consist of purchasers of approximately seventy Wells Fargo mutual funds. *Second,* the proposed class period extends for nearly the same length as that in *Siemers*—from November 2000 through April 2006.[1] *Third,* plaintiffs bring the exact same claims and legal theories as those raised in *Siemers*. Indeed, the first page of the complaint states that it is premised on the Third Amended Complaint in the *Siemers* action. As in *Korwek*, the present case reduces to an attempt to relitigate the prior denial of class certification in *Siemers*.[2]

1. The proposed class period in the present action extends five months longer than in *Siemers* due to plaintiffs' allegations that Wells Fargo did not cease its illegal practices until a few months after the filing of the *Siemers* action. This is insignificant. For all intents and purposes, the proposed class periods for the two actions are identical.

2. Plaintiffs attempt to distinguish this action on the grounds that the new class is comprised of nine subclasses. This argument fails. They do not cite any Ninth Circuit authority where a subclass was tolled under *American Pipe*. Furthermore, the proposed subclasses are the exact same size and scope as the proposed class in *Siemers*. The same manageability concerns exist. Calling the proposed class different than that in *Siemers* is a smoke-and-mirrors argument. This action is an attempt to relitigate the prior denial of class certification.

*American Pipe* tolling cannot be extended to allow plaintiffs in this case to relitigate the earlier denial of class certification. The class allegations are therefore time-barred. But the statute of limitations was tolled for the individual plaintiffs pursuant to *American Pipe.* Accordingly, those plaintiffs may proceed in this action as individual plaintiffs.

#### 4. SUFFICIENCY OF THE COMPLAINT.

Defendants challenge the sufficiency of the complaint on multiple grounds. They argue that the complaint fails to properly allege that the purported omissions and misrepresentations were material, that the complaint fails to adequately plead reliance, that the complaint fails to adequately plead scienter, that the complaint fails to plead the *Gartenberg* factors with particularity, and that the complaint fails to adequately plead causation. Each of defendants' challenges were considered and rejected by *Siemers.* Given that the complaint in the present action is nearly identical to the complaint that survived these same attacks in *Siemers,* this order finds that the complaint is well beyond the threat of a Rule 12(b) dismissal.

#### A. Materiality of Defendants' Omissions.

■ Defendants argue that plaintiffs fail to allege the materiality of any statements or omissions with sufficient particularity "as to any plaintiff, any prospectus, or any purchase or sale of any Wells Fargo Fund." This argument is rejected.

■ To prevail on a 10b–5 claim, plaintiffs must allege with particularity that the statements or omissions at issue were misleading as to material facts. *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). A statement is material only if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having signifi-

cantly altered the total mix of information made available." *Miller v. Thane Int'l. Inc.,* 519 F.3d 879 (9th Cir.2008).

Here, the complaint alleges that Wells Fargo made $350 million in secret kickback revenue-sharing payments during the class period. This was material. These secret payments exemplify the principal wrong—that the fees were not being used for their stated purposes. The payments not only shrank plaintiffs' investments but they also created conflicts of interest that any investor would want to know about before deciding to invest in Wells Fargo mutual funds. As *Siemers* reasoned:

> The defense insists that unless we know the extent of the excess, we cannot tell whether the amounts would have been material. Maybe, they suggest, the excess was tiny. We must not forget that defendants themselves refer to the payments at issue as "significant." This was set forth in most of the prospectuses at issue. Although those disclosures were allegedly inadequate in multiple ways, they repeatedly referred to the payments as "significant." Defendants may not walk away from these admissions. Moreover, any intentional misappropriation from the common fund would have been material to investors. The integrity of management is always of importance to investors. That a fiduciary has been misappropriating the common fund—even in small amounts— would be important to investors, for the next misappropriation or defalcation could be larger. Intentional misappropriation would always be a red flag, a negative factor of material interest to investors.

*Siemers v. Wells Fargo & Co.,* 2007 WL 1140660, at *8. That reasoning still stands. Accordingly, the complaint alleges materiality with adequate particularity.

### B. Reliance.

To adequately plead reliance in a 10b–5 claim, plaintiffs must "prove that the alleged misrepresentations induced them to do something different from what they would otherwise have done in making investment decisions." *In re NationsMart Corp. Sec. Lit.*, 130 F.3d 309, 321 (8th Cir.1998). Generally, the complaint must plead individual reliance by the plaintiffs. But the Supreme Court recognized an exception to this rule in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). That decision permitted a presumption of reliance where the defendant omitted material information from its communications with the plaintiff. It held that, in those circumstances, "proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153–54, 92 S.Ct. 1456.

Here, the action falls within the *Ute* exception. *Siemers* again is directly on point. That decision held:

> Movant's argument conflicts with the express command of the Supreme Court in *Affiliated Ute Citizens of Utah*, which held that "positive proof of reliance is not a prerequisite" when the case involves "primarily a failure to disclose," not exclusively a failure to disclose. This order holds that plaintiff need not make independent allegations of reliance because he adequately pleads causation by accusing defendants of material omissions resulting in half truths.

*Siemers v. Wells Fargo & Co.*, 2006 WL 2355411, at *11. The facts are the same here. As stated, defendants' material omissions, the secret revenue-sharing agreements, resulted in half truths for the purposes of *Ute*. Accordingly, the complaint adequately pleads reliance.

### C. Scienter.

To plead the requisite facts for scienter, a complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness. In 2007, the Supreme Court explained that the PSLRA requires a stringent pleading standard for scienter. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). It held that the complaint "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Id.* at 2513. The Ninth Circuit has reasoned that the *Tellabs* standard requires a plaintiff to "plead a highly unreasonable omission ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir.2009).

The complaint adequately pleads scienter within the standard set forth in *Tellabs*. Wells Fargo and its key officers knew about its secret revenue-sharing program. They knew it was inadequately disclosed in the prospectuses. These secret agreements were part of a persistent and deliberate scheme to use half truths to conceal a thriving system of kickbacks. Moreover, those inadequate disclosures were not the result of simple, or even inexcusable negligence. The way in which the secret program was buried in the prospectus indicates that defendants deliberately chose to hide it from the investors. As recognized in *Siemers*, "[t]hat they went to some trouble to allude to [the agreements] in vague and incomplete language and buried the passages in unexpected placements indicates that they knew of its significance, yet chose to mislead." *Siemers*, 2007 WL 1140660, at *12. These facts raise a strong inference of

intentional misleading by defendants on a "material investment decision."

### D. *Gartenburg factors.*

Defendants argue that plaintiffs fail to allege with particularity that the fees were excessive under *Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923 (2nd Cir.1982). But *Gartenberg* does not require those factors to be proved at the pleading stage. Defendants have not identified any decisions to the contrary. Indeed, *Siemers* recognized that "there is no requirement that the *Gartenberg* factors be pled and no decision so holds. That decision came after a full trial and was not a pleading case. Moreover, it involved Section 36(b), not the 1933 and 1934 Acts." *Siemers*, 2007 WL 760750, at *13 (citing *Gartenberg*, 694 F.2d 923). Defendants go through great lengths to explain what must be proven at trial. But this is not at issue. Their argument fails.

### E. Causation.

■■■■■ Damages in Rule 10b–5 claims are limited to cognizable economic losses that are attributed to the fraud of the defendant. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). The complaint pleads that at a minimum plaintiffs' losses were equal to the money taken from the mutual fund to pay for the secret revenue-sharing agreements. This is adequate for the pleading stage.

Defendants argue that loss causation damages are adequate only if the plaintiff alleges that the defendants' fraud caused the value of the securities to drop. Their reliance on *Dura* is inapposite. That decision merely stands for the proposition that "a plaintiff must prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's loss." *Dura*, 544 U.S. at 346, 125 S.Ct. 1627. As *Siemers* explained:

> One measure of loss causation approved by the Supreme Court was the familiar story of a plummet in the share price after the truth became known. That, however, was only one way to plead loss causation, not the only way. The Supreme Court stated that "ordinary pleading rules are not meant to impose a great burden upon a plaintiff" and that "it should not prove burdensome for a plaintiff ... to provide a defendant with some indication of the loss and the casual connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).
>
> Here, plaintiffs have provided such an indication. They allege that the loss was, at a minimum, the dollars siphoned out of the corpus for undisclosed purposes of no benefit to investors. Every dollar lifted out of the corpus reduced the net assets of the fund and reduced its ability to earn income. Defendants are correct that there was no drop in share value after the truth was revealed. That is because the underlying portfolio and its net asset value was the same just before and just after. Dressed up as fees, cash was being misappropriated from the common fund. The fees were not used for their ostensible purposes but were diverted to support ongoing distribution. The true price of admission to the fund was greater than was represented. At least that is the allegation. It is sufficient at this stage.

*Siemers v. Wells Fargo & Co.*, 2007 WL 760750, at *14. The complaint in *Siemers* is substantially similar to the present complaint with regards to loss causation. The reasoning in *Siemers* still applies. The pleadings are sufficient.

The complaint states a claim under Rule 10b–5 with adequate particularity. Accordingly, defendants' motion to dismiss this claim is denied.

## CONCLUSION

This order finds that plaintiffs were on inquiry notice no later than December 2005—more than two years before the filing of this action. Plaintiffs' *individual* claims were tolled by the filing of *Siemers*. The *class* claims, however, were not tolled by the filing of *Siemers*. Accordingly, plaintiffs may continue in this action as individuals but the class allegations are dismissed. Because the class allegations are untimely, they are dismissed without leave to amend. The complaint otherwise states a valid claim for relief. Defendants' motion to dismiss plaintiffs' individual claims is thus DENIED.

**IT IS SO ORDERED.**